**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2013-CA-01089-SCT**

*RICKY CHASE a/k/a RICKY ROY CHASE*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 05/06/2013 |
| TRIAL JUDGE: | HON. LAMAR PICKARD |
| TRIAL COURT ATTORNEYS: | JAMES W. CRAIG |
| | CYNTHIA ANN STEWART |
| | MARVIN L. WHITE, JR. |
| COURT FROM WHICH APPEALED: | COPIAH COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JAMES W. CRAIG |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| | JASON L. DAVIS |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | AFFIRMED - 04/23/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**EN BANC.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1.     Ricky Chase filed a motion for post-conviction relief (PCR) in the Circuit Court of

Copiah County arguing that he is intellectually disabled under *Atkins v. Virginia*, 536 U.S.

304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), and exempt from execution. The circuit court

denied relief, finding that Chase had failed to prove by a preponderance of the evidence that

he is intellectually disabled.[1] Chase appeals, arguing that the circuit court made legal errors and that its fact-findings were clearly erroneous. We affirm. We take the opportunity presented by this case to recognize the definitions of intellectual disability promulgated by the American Association on Intellectual and Developmental Disabilities in 2010 and the American Psychiatric Association in 2013. We hold that these definitions may be used in our courts in determining whether a criminal defendant is intellectually disabled for the purposes of the Eighth Amendment.

**PROCEDURAL HISTORY**

¶2.     Chase was convicted of the August 14, 1989, capital murder of Elmer Hart and sentenced to death. He appealed, raising twenty assignments of error related to the guilt and sentencing phases of his trial. This Court affirmed his conviction and sentence on February 24, 1994, and denied rehearing on December 8, 1994. ***Chase v. State***, 645 So. 2d 829 (Miss. 1994), *cert. denied*, ***Chase v. Mississippi***, 515 U.S. 1123, 115 S. Ct. 2279, 132 L. Ed. 2d 282, (1995), *reh. denied*, 515 U.S. 1179, 116 S. Ct. 20, 132 L. Ed. 2d 903 (1995). On July 15, 1996, Chase filed an application for leave to file a motion for PCR pursuant to the Uniform Post-Conviction Collateral Relief Act (UPCCRA). Miss. Code Ann. §§ 99-39-1 to 99-39-29 (Rev. 2007). This Court denied his application on August 7, 1997. ***Chase v. State***, 699 So. 2d 521 (Miss. 1997).

---

[1] The terms "intellectually disabled" and "intellectual disability" have replaced the terms "mentally retarded" and "mental retardation" in the professional vernacular. The United States Supreme Court has recognized this change. ***Hall v. Florida***, ___ U.S. ___, 134 S. Ct. 1986, 1990, 188 L. Ed. 2d 1007 (2014). These terms have the same legal meaning. ***Id.*** In this and future opinions this Court will use the new terminology except where a quotation necessitates use of the older terminology.

¶3.    Next, Chase filed a petition for writ of habeas corpus in the United States District Court for the Southern District of Mississippi. *See Chase v. Epps*, 74 Fed. App'x. 339, 340 (5th Cir. 2003). The district court denied relief but issued a certificate of appealability on a single issue concerning Chase's trial counsel's handling of the evidence of his mental retardation. *See id.* at 341. The United States Court of Appeals for the Fifth Circuit affirmed the denial of habeas relief on August 7, 2003. *Id.* at 345. The Fifth Circuit denied Chase's petition for panel rehearing and his petition for rehearing en banc. *Chase v. Epps*, 83 Fed. App'x 673 (5th Cir. 2003). The United States Supreme Court denied Chase's petition for a writ of certiorari on May 17, 2004. *Chase v. Epps*, 541 U.S. 1050, 124 S. Ct. 2180, 158 L. Ed. 2d 746 (2004).

¶4.    On June 20, 2002, the Supreme Court decided *Atkins v. Virginia*, which held that the execution of an intellectually disabled individual constitutes cruel and unusual punishment prohibited by the Eighth Amendment. *Atkins*, 536 U.S. at 321, 122 S. Ct. 2242. This decision prompted Chase to file a successive application for leave to file a motion for PCR in this Court. *Chase v. State*, 873 So. 2d 1013, 1016 (Miss. 2004). We held that, although the UPCCRA permits a defendant to file only one motion for PCR, the intervening *Atkins* decision excepted Chase's case from that procedural bar. *Id.* (citing Miss. Code Ann. § 99-39-27(9) (Supp. 2000)). In ruling on Chase's application, this Court set out two definitions of mental retardation to be used in our courts and established the prerequisites for a hearing and "the procedure to be used in reaching a determination of mental retardation." *Id.* at 1027-30. We granted the application because Chase had met the prerequisites and, on

3

May 20, 2004, we remanded the case to the circuit court for an evidentiary hearing on the issue of whether Chase is intellectually disabled within the meaning of **Atkins**. **Id.** at 1030.

¶5.     The evidentiary hearing occurred on August 16-17, 2010. On November 8, 2010, the circuit court issued an order finding that Chase is not intellectually disabled. In so holding, the circuit court simply adopted the proposed findings of fact and conclusions of law submitted by the State. Chase appealed, and, on January 15, 2013, this Court issued an order vacating the circuit court's judgment and remanding for the circuit court to issue its own findings of fact and conclusions of law. **Chase v. State**, 112 So. 3d 421, 422 (Miss. 2013). We also clarified that "psychologists and psychiatrists rendering opinions on mental retardation in death penalty cases may rely on the testing administered by others." **Id.** at 421 (citing M.R.E. 703). On May 6, 2013, the circuit court entered an order finding that Chase is not intellectually disabled and later denied his motion for reconsideration. Chase has appealed.

## DEFINITIONS OF INTELLECTUAL DISABILITY

### A. *Atkins*/*Chase* standard

¶6.     In Chase's 2002 appeal, this Court addressed the *Atkins* decision. We recognized "that *Atkins* exempts all mentally retarded persons – even those who are minimally mentally retarded – from execution." *Chase*, 873 So. 2d at 1026. Because *Atkins* left to the states the task of defining intellectual disability, and because our Legislature had not undertaken that task, we provided two complementary definitions of intellectual disability that were cited with approval in *Atkins*. *Id.* at 1027-28; *see* *Foster v. State*, 848 So. 2d 172, 175 (Miss.

4

2003) (adopting the definitions from *Atkins*). The definition from the American Association

on Mental Retardation states:

> Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, community use, self-direction, health and safety, functional academics, leisure, and work, Mental retardation manifests before age 18.

*Id.* at 1027 (quoting *Atkins*, 536 U.S. at 308 n.3, 122 S. Ct. 2242 (citing *Mental Retardation:*

*Definition, Classification, and Systems of Support* 5 (9th ed.1992))). The American

Psychiatric Association's definition states:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 39 (4th ed. 2000).

*Chase*, 873 So. 2d at 1028 (quoting *Atkins*, 536 U.S. at 308 n. 3, 122 S.Ct. 2242). This Court

held that these definitions "provide a clear standard to be used in this State by our trial courts

in determining whether, for Eighth Amendment purposes, a criminal defendant is mentally

retarded." *Chase*, 873 So. 3d at 1028.

¶7.     We also recognized that, while mild intellectual disability describes persons with an

IQ between 55 and 70, intellectual disability "may, under certain conditions, be present in

an individual with an IQ of up to 75." *Chase*, 873 So. 2d at 1028 n.18; *see Hall v. Florida*,

___ U.S. ___, 134 S. Ct. 1986, 188 L. Ed. 2d 1007 (2014). We observed that

> IQ, alone, does not determine mental retardation. According to the DSM-IV, "it is possible to diagnose Mental Retardation in individuals with IQ's between 70 and 75 who exhibit significant deficits in adaptive behavior." Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning.

*Chase*, 873 So. 2d at 1028 n.18.

¶8.     *Chase* promulgated a procedure to be used to determine a defendant's claim of intellectual disability. We held that, for entitlement to a hearing on the issue of intellectual disability, the defendant must produce an expert who testifies that: (1) the defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or the American Psychiatric Association; and (2) the defendant has completed the Minnesota Multiphasic Personality Inventory–II (MMPI–II) and/or other similar tests, and the defendant is not malingering. *Chase*, 873 So. 2d at 1029. Subsequently, this Court clarified that our trial courts are free to use the MMPI-II or similar tests, the Wechsler Adult Intelligence Scales Test, the Structured Interview of Reported Symptoms (SIRS), the Validity Indicator Profile (VIP), and the Test of Memory Malingering (TOMM), and/or other tests suggested and approved by mental health professionals in determining intellectual disability and/or malingering. *Lynch v. State*, 951 So. 2d 549, 556 (Miss. 2007). At a hearing on intellectual disability, the defendant must prove by a preponderance of the evidence that "(1) he has significantly subaverage intellectual functioning; (2) he has deficits in two or more adaptive skills; (3) he was eighteen or younger when the retardation manifested itself; and (4) he is not malingering." *Thorson v. State*, 76 So. 3d 667, 676-77 (Miss. 2011). We also

6

have held that, because *Atkins* is concerned with whether an individual was intellectually disabled at the time of the crime and whether the intellectual disability manifested prior to age eighteen, intellectual disability must be assessed retrospectively to those relevant times. *Goodin v. State*, 102 So. 3d 1102, 1115 (Miss. 2012). To this end, an individual's present functioning is relevant if it is informative of the individual's condition at the time of the crime and/or prior to age eighteen.

*B. Recent definitions of intellectual disability*

¶9.　Since our adoption of the definitions of mental retardation in *Foster* and *Chase*, our Legislature has not enacted legislation addressing the constitutional ban on the execution of the intellectually disabled. Thus, it remains this Court's duty "to set the limits and define the procedure which will safeguard the Eighth Amendment protection of mentally retarded persons, as required by *Atkins*." *Chase*, 873 So. 2d at 1027. But in *Hall v. Florida*, the United States Supreme Court held that states' discretion to define intellectual disability for Eighth Amendment purposes is not unlimited. *Hall*, ___ U.S. ____, 134 S. Ct. at 1998. We are mindful of *Hall*'s directive that the states lack "unfettered discretion to define the full scope of the constitutional protection" and that "*Atkins* provide[s] substantial guidance on the definition of intellectual disability." *Hall*, ___ U.S. ____, 134 S. Ct. at 1998-99.

¶10.　This case presents the Court with the opportunity to recognize developments in the field of assessing intellectual disability that have manifested since *Atkins* and *Chase*. Since *Atkins*, the American Association on Mental Retardation (AAMR), recently renamed the American Association on Intellectual and Developmental Disability (AAIDD), promulgated

7

new definitions of intellectual disability that changed the terminology applicable to adaptive functioning. In 2002, the AAMR promulgated the following definition: "Mental Retardation is a disability characterized by significant limitations in both intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills." *Mental Retardation: Definition, Classification, and Systems of Support* 1 (10th ed. 2002). In 2010, the AAIDD promulgated a definition that changed the term "mental retardation" to "intellectual disability." The 2010 definition states: "Intellectual Disability is characterized by significant limitations in both intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills." *Intellectual Disability: Definition, Classification, and Systems of Support* 1 (11th ed. 2010). Intellectual disability must have originated prior to age eighteen. *Id.*

¶11.    The 2010 AAIDD manual defines each domain of adaptive functioning. The conceptual skills domain includes "language; reading and writing; and money, time, and number concepts." *Id.* at 44. The social skills domain includes "interpersonal skills, social responsibility, self-esteem, gullibility, naïveté (i.e., wariness), follows rules/obeys laws, avoids being victimized, and social problem solving." *Id.* The practical skills domain includes "activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone." *Id.* For a diagnosis of intellectual disability, an individual must have significant deficits in one of the three adaptive functioning domains. *Id.* at 43.

¶12.    In 2013, after the hearing presently under review, the American Psychiatric

8

Association also promulgated a new definition of intellectual disability: "Intellectual disability (intellectual developmental disorder) is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains." *Diagnostic and Statistical Manual of Mental Disorders* 33 (5th ed. 2013). The APA's description of the adaptive functioning domains is similar to the AAIDD's description:

> The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problems solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others.

*Id.* at 37. The adaptive functioning prong is met when the individual has significant limitations in one of the three domains. *Id.* at 38.

¶13.    The new AAIDD and APA definitions are similar and require the same three basic elements of intellectual disability as the earlier definitions: significantly subaverage intellectual functioning, significant deficits in adaptive behavior, and manifestation before age eighteen. Although the new definitions changed the terminology applicable to adaptive functioning, other courts have recognized that "the exact wording of the various standards makes little substantive difference in this *Atkins* context." *U.S. v. Williams*, 1 F. Supp. 3d 1124, 1146 (D. Haw. 2014) (citing *U.S. v. Hardy*, 762 F. Supp. 2d 849, 879-80 (E.D. La. 2010)). This is because both the earlier and later standards promulgated by the AAIDD and

9

the APA "direct clinicians to the same standardized measures of adaptive behavior, such as the Vineland Adaptive Behavior Scales–II (VABS–II) and the [AAIDD's] Adaptive Behavior Scale." *Williams*, 1 F. Supp. 3d at 1147 (quoting *Hardy*, 762 F. Supp. 2d at 879-80). And "[e]ven after release of the DSM–5, prong two still 'generally requires a more expansive investigation of a defendant's life history and skill levels than could be fully evaluated through use of a normed instrument,'" and still involves "significantly more subjective clinical judgment." *Id.* (quoting *U.S. v. Salad*, 959 F. Supp. 2d 865, 878 (E.D. Va. 2013)).

¶14. The experts presented by both Chase and the State relied on the 2010 AAIDD definition in this case. Dr. Gerald O'Brien testified that, to a practicing psychologist, the differences in the 2010 AAIDD definition and the *Atkins/Chase* definitions are not professionally significant. Dr. Daniel Reschly, who relied on the 2010 AAIDD definition throughout his report, testified that the conclusions he reached under that definition were comparable to those reached under the *Atkins/Chase* definitions. He testified that, under either the *Atkins/Chase* definitions or the 2010 AAIDD definition, Chase had significant limitations in intellectual functioning and in adaptive behavior that manifested prior to age eighteen.

¶15. This Court is faced with the reality of evolving standards for determining intellectual disability in the medical community. While a legal determination of intellectual disability for the purposes of the Eighth Amendment is distinct from a medical diagnosis, *Hall* ___ U.S. ___, 134 S. Ct. at 2000, legal determinations of intellectual disability are informed by

established clinical standards. *See **Hall***, ___ U.S. ___, 134 S. Ct. at 1993. ***Hall*** held that "***Atkins*** provide[s] substantial guidance on the definition of intellectual disability." ***Hall***, ___ U.S. ___, 134 S. Ct. at 1999. And ***Hall*** recognized the significant role of the medical community in informing legal determinations of intellectual disability, stating:

> That this Court, state courts, and state legislatures consult and are informed by the work of medical experts in determining intellectual disability is unsurprising. Those professionals use their learning and skills to study and consider the consequences of the classification schemes they devise in the diagnosis of persons with mental or psychiatric disorders or disabilities. Society relies upon medical and professional expertise to define and explain how to diagnose the mental condition at issue. And the definition of intellectual disability by skilled professionals has implications far beyond the confines of the death penalty: for it is relevant to education, access to social programs, and medical treatment plans. In determining who qualifies as intellectually disabled, it is proper to consult the medical community's opinions.

*Hall*, ___ U.S. ___, 134 S. Ct. at 1993.

¶16.    In 2004, this Court adopted the AAMR and APA definitions of intellectual disability cited in ***Atkins***. As part of the medical community's evolving understanding of intellectual disability and its diagnosis, those institutions have promulgated new definitions of intellectual disability that are generally accepted in the medical community. The new definitions have not materially altered the diagnosis of intellectual disability but have provided new terminology. ***Williams***, 1. F. Supp. 3d at 1146. We find that judicial recognition of the new terminology conforms with the directives of ***Atkins*** and ***Hall*** and will facilitate legal determinations of intellectual disability by allowing our courts to rely on the newer, generally-accepted definitions most frequently used by modern clinicians. We now adopt the 2010 AAIDD and 2013 APA definitions of intellectual disability as appropriate for

11

use to determine intellectual disability in the courts of this state in addition to the definitions promulgated in *Atkins* and *Chase*.

## FACTS

¶17.	At the hearing, Chase presented the testimony of Dr. Daniel Reschly, a professor of education and psychology at Peabody College of Vanderbilt University, who is permanently licensed as a school psychologist in Arizona and Iowa, and Dr. Gerald O'Brien, a licensed Mississippi psychologist. Considering test results, personal history records, an interview with Chase, and Dr. Reschly's third-party interviews, both opined that Chase was intellectually disabled. Chase also called Amanda Gugliano, a postdoctoral clinician at the Mississippi State Hospital who performed the IQ testing of Chase during his mental evaluation at the state hospital on January 11, 2010. The State presented the testimony of Dr. Gilbert Macvaugh, a licensed psychologist who supervised Chase's mental evaluation at the state hospital. The psychologists' reports and the documentation of Chase's personal history on which they relied was admitted into evidence.

*A. Chase's evidence*

**1. Gugliano**

¶18.	Gugliano testified that she administered the Weschler Adult Intelligence Scale, Fourth Edition (WAIS-4), to Chase to determine his IQ score. She testified that Chase's full-scale IQ score was 72, and that this score was adjusted to 71 due to the Flynn Effect, a phenomenon under which IQ scores become artificially inflated as the test becomes outdated. She testified that the margin of error for the WAIS-4 is plus or minus five points, meaning

12

that Chase's full-scale IQ would fall between 67 and 76. The report noted that, in 1989, after his capital-murder arrest, Chase had been assessed for intellectual disability by Dr. John W. Perry. Dr. Perry administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R), the Wide Range Achievement Test-Revised (WRAT-R), and the Wechsler Memory Scale and assessed Chase as having a full-scale IQ of 71. Gugliano also administered the TOMM, which showed that Chase was not malingering, or pretending to have, cognitive impairment. However, the state hospital's report noted that Chase was ill and fatigued when the tests were administered and that these conditions may have negatively affected his performance.

### 2. Dr. Reschly

¶19.    Dr. Reschly testified that he has studied the psychology of intellectual disability since 1967. He specialized in school psychology, and he testified that school psychologists "are responsible for more diagnoses in [intellectual disability] than any other psychological or medical specialty." He testified that, for twenty years, he has been active in the American Psychological Association Division 33, a division devoted to developmental disabilities and intellectual disabilities. He taught psychology programs at the University of Arizona and Iowa State University. Dr. Reschly testified that, in the course of his work, he supervises counseling psychologists who evaluate individuals for intellectual disability. He testified that he has evaluated individuals for intellectual disability on numerous occasions and has presented several papers to the American Psychological Association on the question of intellectual disability in death penalty cases.

¶20.    Dr. Reschly relied on the testing performed at the state hospital and by Dr. Perry to

find that Chase met the intellectual-functioning prong of the test for intellectual disability. He also found that Chase had significant limitations in adaptive functioning that manifested prior to age eighteen. Dr. Reschly expressed his findings in terms of the 2010 AAIDD definition of intellectual disability and found that Chase had significant limitations in the conceptual, social, and practical domains. But he also testified that, under the 2002 definitions, Chase was deficient in seven areas: communication, self-direction, functional academics, work, social/interpersonal skills, use of community resources, and safety. To reach these conclusions, Dr. Reschly relied on Chase's school records from the Hazlehurst Public Schools, the 2010 Mississippi State Hospital Report, Dr. Perry's 1989 report, Chase's social security records, his driver's license records, testimony from Chase's trial, and interviews with Chase's teachers, relatives, and friends who knew him prior to age eighteen.

### a. Conceptual skills

¶21. Dr. Reschly stated that "poor and failing school performance prior to age 18 is a significant indicator of significant limitations in the conceptual skills domain." He identified a downward trend in Chase's grades from first to tenth grade. Chase's school records show that he performed above average from the first through fourth grades, showed some decline in the fifth grade, and began performing below average in the sixth grade. He repeated the tenth grade and dropped out of school before completing his second year in tenth grade. Dr. Reschly stated that this downward trend in grades is "frequently seen with persons with mental retardation due to the increasingly abstract nature of the school curriculum and academic demands."

¶22. Chase's ninth-grade science teacher, Ida Minor, his civics teacher, Foster Topp, and his sister-in-law, Sita Johnson, all said that they saw Chase daily and that he had been very slow to learn and to apply abstract information. Topp said Chase was among the lowest students in his class. Chase's middle-school girlfriend, Sandra Adams, and Shirley Norrells, the mother of Chase's high-school girlfriend, Deborah Norrells, said that Chase was exceptionally slow and needed assistance with his homework. According to Dr. Reschly's investigation, Hazlehurst Public Schools did not have special education services during the period that Chase was in school from 1975 to 1985.

¶23. Dr. Reschly found that Chase had language deficits. He found from his interview with Chase that he "produced verbal language at a very high rate, but frequently was repetitive, rambling, directionless, and without clear purpose." He opined that Chase frequently did not understand his own statements, could not organize his thoughts logically, and jumped from one topic to another in the same sentence. Dr. Reschly provided several examples of these sentences, including, "My sister, you gotta catch her, she works all the time, like a kangaroo," "One of my teachers called my mother, she said she was pleased with my progress in school but didn't like the girl," and, asked what he learned in the Job Corps, Chase stated "welding . . . I started in culinary arts and business administration but once again, chasing girls, got lured into welding." Dr. Reschly found these and other statements "either illogical or patently untrue." He also found that Chase did not understand his culpability for the capital murder, which showed abstract thinking deficits. He interviewed Jerome Cleveland, who had played football with Chase. Cleveland said that, while Chase was a fast and successful football

15

player, he had been too intellectually slow to follow the plays.

¶24.    Dr. Reschly noted that several persons he interviewed said that Chase often told "wildly improbable" stories and often misunderstood normal conversations. Dr. Reschly found Chase's statement that he had been expelled from school for having sex on campus to be untrue because Minor said that had never happened and if it had, the teachers would have known. Dr. Reschly also found Chase's statement that, at age twelve, while trying to dunk a basketball, he had hit his head on the basketball rim so hard he had passed out, to be untrue because it was implausible. He stated that Chase also gave incredible explanations for leaving employment, such as a fear of snakes, intolerance of cold weather, excessive heat, and a sexual liaison. Dr. Reschly stated that his interviews indicated that the real reason Chase had left these jobs was his incompetence, and Chase's incredible explanations were an attempt to pass as normal, which is indicative of intellectual disability.

¶25.    Addressing reading and writing skills, Dr. Reschly found that Chase had scored in the twentieth percentile on several achievement tests administered during his childhood and adult years. He opined that these scores rendered him functionally literate, but that they conflicted with the observations of those around Chase. Dr. Reschly said that several observers claimed Chase could not do his own homework and could not read well enough to understand simple directions, such as those on a box of macaroni and cheese. Nonetheless, Dr. Reschly found that "Chase has a relative strength, for a person with mental retardation, in reading and writing." On cross-examination, he stated that Chase's reading and writing skills were not at the level typically found with intellectual disability. But he stated that Chase's functional

16

literacy does not rule out intellectual disability, and that persons with intellectual disability "are expected to have strengths and weaknesses."

¶26. Dr. Reschly also found Chase deficient in money, time, and number concepts. Chase's mother said that Chase did not understand money. Johnson, who knew him from ages twelve through fourteen, said that he did not understand money and could not tell time accurately. Dr. Reschly noted Chase's statement in his interview that he did not trust banks with his money. Dr. Reschly stated that Chase could not understand the seven-percent sales tax. He opined that Chase's difficulty telling time contributed to his chronic lateness and missed appointments in middle and high school.

### b. Social Skills

¶27. Dr. Reschly found that Chase had significant limitations in the area of social skills caused by his intellectual limitations. He found that Chase made ineffective attempts to fit in, was heavily dependent on a benefactor for social guidance, and was naive, gullible, and frequently exploited by others. While Chase attempted to fit in with peers by telling tall stories, he seemed oblivious to his peers's negative reactions to his tall stories, had trouble following the gist of conversations, and repeated others' ideas. Dr. Reschly described this behavior as an attempt to pass as normal. His teachers, Minor and Johnson, said that Chase did not interact normally with other children and often befriended younger children. Dr. Reschly opined that Chase had befriended younger children in order to better understand the social interaction and that this was characteristic of intellectual disability. Shirley Norrells said that Chase rarely interacted with other boys visiting her home. Chase's mother and

17

Shirley both recalled that Chase's girlfriend Deborah had controlled Chase, including during social interactions and daily activities. Dr. Reschly stated that Chase confirmed that he had few friends as a child and never had a best friend. Dr. Reschly opined this history was consistent with intellectual disability, because most intellectually disabled persons have "inadequate social skills and limited interactions with normal peers."

¶28. Dr. Reschly found that Chase exhibited deficits in social responsibility; he was chronically late; he could not complete his homework; and he could not reliably purchase items from a grocery list. Topp, Chase's civics teacher, said that Chase's failing grade in his class showed that he was "really, really low" and could not understand his rights and responsibilities as a citizen. Dr. Reschly also found a deficit in social responsibility from the fact that Chase may have fathered a child out of wedlock. On cross-examination, Dr. Reschly admitted that this finding was based on his own moral judgment that fathering a child out of wedlock showed an adaptive behavior deficit.

¶29. Dr. Reschly found that Chase had a deficit in self-esteem, because he was excessively dependent on others who made fun of him because he was slow and unskilled. He found that Chase was highly dependent on others, especially Deborah and Shirley Norrells, to make decisions for him, and that the Norrells had acted as "benefactors," who are persons critical to the coping skills of an intellectually disabled person. He noted that Chase's statement that, if only he had gone to Deborah's house on the morning of the crime as Deborah had asked him to do, he never would have gotten into trouble.

¶30. Dr. Reschly found that Chase was gullible and easily led by others. Adams and

18

Johnson said that other children often cheated or tricked Chase out of the money his mother gave him. Adams also said that, unlike the other boys his age that she had dated, Chase was "slow and backward" sexually and that she had to teach him about kissing and light petting. Dr. Reschly found that this description contrasted significantly with Chase's elaborate tales of sexual conquest.

¶31. Regarding following rules and obeying laws, Chase's mother informed Dr. Reschly that Chase was much slower to follow directions than other children and needed increased supervision and direct guidance. Dr. Reschly noted that Chase also had abused a wide range of illegal drugs beginning at age twelve or thirteen and also had committed legal violations during his teen years. Dr. Reschly found that Chase's compliance with rules was greatly dependent on Deborah; Chase admitted in his interview that Deborah had "helped [him] decide things and kept [him] out of trouble."

### c. Practical Skills

¶32. Dr. Reschly found that Chase had severe adaptive behavior limitations in the practical skills domain and "likely cannot care for himself competently nor support himself economically or maintain himself in the community as a respectable citizen." He found particularly significant Chase's statement that, if he was released from prison, he would want to live with his mother but, if she had already passed away, he would want to stay in prison because he needed someone to take care of him.

¶33. Regarding daily living activities, Chase's mother said that Chase had been more difficult than other children to accomplish developmental milestones such as toilet training.

19

Chase's mother said he could cook a little. Persons recalled that Chase's mother still picked out his clothes in high school. Chase stated that he washes his clothes in his prison cell toilet because he believes the prison laundry service is dirty, and Dr. Reschly found this action to be lacking in reason and judgment. Further, Chase reported that he had not slept for several days except for one nap, which Dr. Reschly found to be impossible. Dr. Reschly found that Chase's statement that he removes salt from noodles by running water over them was incredible. Overall, Dr. Reschly found Chase's daily living skills to be a mix of some good habits, good grooming, and cleanliness, along with some bad habits.

¶34. Dr. Reschly also found deficiencies in Chase's occupational skills. Social security records showed that Chase had may different employers and that his employment generally was short-term. Marshall Gordon, Chase's peer in middle school and high school, told Dr. Reschly that Chase had been unable to use tools competently in industrial arts class such as a hammer, handsaw, and chisel. Chase watched others work but completed no projects of his own and did not receive credit for the course. From this, Dr. Reschly concluded that Chase had very poor spatial relations. Shirley stated that Chase could not change a light bulb. Chase's mother and Johnson recalled that Chase soon was dismissed from his few jobs because he could not do the work or could not manage the social demands of the workplace. Dr. Reschly stated that Chase told unbelievable stories about the reasons for his dismissal from jobs, and he "strongly suspect[ed]" that Chase had lost these jobs due to incompetence.

¶35. Dr. Reschly said that Chase did not understand or appropriately handle money because Chase said he did not trust banks and would rather hold his money himself, because Chase's

mother had left money for him daily, and because others reported that Chase could not handle money and frequently lost his money when other kids cheated him. Also, Chase has never paid rent, and he told Dr. Reschly that he cannot keep track of his prison commissary expenses.

¶36. Dr. Reschly found that Chase's safety and health care skills were deficient because he will not take the prescribed medication for his high blood pressure, stating that he does not "want to become dependent." Dr. Reschly also concluded that Chase "was significantly delayed and deficient in acquiring and using skills related to travel and transportation." He found that Chase had never had a driver's license because, although Chase claimed to have been issued a South Carolina driver's license, there was no record of it and Chase's description of obtaining the license was suspicious. And Shirley testified that Chase had been unmotivated to drive and had been completely dependent on others for transportation to his various jobs and during his school years. Because others reported that Chase was chronically late and could make appointments only with Deborah's assistance, Dr. Reschly concluded that Chase was deficient in the area of schedules and routines. He noted that Chase had no trouble using the telephone.

### 3. Dr. Gerald O'Brien

¶37. Dr. O'Brien testified that he has practiced clinical forensic psychology in Mississippi for thirty years, and that his practice includes the diagnosis of intellectual disability. He reviewed the testing, records, and other information gathered by the other experts in this case. Dr. O'Brien testified that he interviewed Chase and administered a single test, a brief ability

test called the Shipley-II, and the results were consistent with Chase's scores on the other ability tests. He did not administer a malingering test. From Dr. O'Brien's review of all the evidence, he concluded that Chase was intellectually disabled under the *Atkins* standard. He concluded that, under the 2010 AAIDD definition, Chase was severely deficient in conceptual skills and practical skills, but not in social skills.

¶38.    Dr. O'Brien stated that, due to the phenomenon of the "cloak of competency," a psychologist should not rely on self-reporting of abilities by the person being assessed for intellectual disability. This is because intellectually disabled persons often want to appear competent and will misreport the reasons for their problems with school, socializing, and employment to hide the fact that real cause of the problems is intellectual disability.  He testified that Chase exhibited this phenomenon. Dr. O'Brien stated that, in childhood and adolescence, Chase was greatly dependent on his mother, his girlfriends, and others, and now he is dependent on the prison system's structured environment to care for his needs. Dr. O'Brien believed that, due to Chase's test scores, the school data, and others' descriptions of Chase, Chase's vocabulary usage did not necessarily reflect his actual abilities.

*B. State's Evidence*

### 1. Dr. Gilbert Macvaugh

¶39.    Dr. Macvaugh testified that he is a licensed clinical and forensic psychologist at the Mississippi State Hospital. He and a forensic evaluation team, including Gugliano and Dr. Reb McMichael, performed a mental evaluation of Chase on January 11, 2010, and generated a report. Dr. Macvaugh's report stated that Dr. Macvaugh had relied on court records, school

22

records, hospital records, correctional records from 1990-2009, prior testing, Dr. Perry's psychological evaluation, a report by S. Ray Pate Jr. dated February 14, 1990, a handwritten statement by Chase, a three-hour-and-twenty-five-minute clinical interview with Chase, and psychological testing performed by Gugliano, including the WAIS-IV, the WRAT-4, and the TOMM.

¶40. Dr. Macvaugh's report stated that Chase was forty-one years old and never had been married. The report discussed Chase's prior mental evaluations. Dr. Perry performed a mental evaluation of Chase on December 11, 1989, after his arrest for capital murder. Dr. Perry administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R), which showed that Chase had a full-scale IQ score of 71. He had a verbal IQ score of 77 and a performance IQ score of 64. Dr. Perry did not test for malingering, but he noted that Chase had not appeared to put forth his best effort in the performance part of the test. However, he believed the testing gave a "fairly good estimate" of Chase's mental ability. Dr. Perry also administered the Weschler Memory Scale, on which Chase attained a 99, in the average range. He also gave Chase the WRAT-R, which showed Chase had reading recognition skills at the tenth-grade level and spelling and arithmetic skills at the seventh-grade level. Dr. Perry found Chase competent to stand trial, and he deemed his intellectual ability to be "at least in the borderline range."

¶41. On February 14, 1990, Dr. Ray Pate performed a psychiatric evaluation of Chase at the Copiah County Detention Center. He noted that, after his capital-murder arrest, Chase had attempted suicide and had been hospitalized, but that the next day he was deemed

medically safe and returned to jail. Dr. Pate was unable to detect any memory deficit or mental illness. Dr. Mark Webb evaluated Chase's mental functioning on February 4, 1998, as part of Chase's effort to secure a hearing on intellectual disability. Dr. Webb reviewed Chase's medical records and prior mental evaluations. He found that the thirteen-point difference between Chase's verbal score of 77 and performance score of 64 on the WAIS-R was indicative of a learning disability and adaptive behavior deficiency. He found to a reasonable degree of psychiatric certainty that Chase suffered from mild mental retardation and that further evaluation was necessary.

### a. Intellectual Functioning

¶42.    Dr. Macvaugh concluded, to a reasonable degree of psychological certainty, that Chase has borderline intellectual functioning and is not intellectually disabled within the meaning of *Atkins*. Regarding the intellectual functioning prong, Dr. Macvaugh found that Chase's test results showed a full-scale IQ score of 71 and that he was not malingering. But Dr. Macvaugh noted that, while nothing indicated Chase had attempted to seem more cognitively impaired than he really was, other factors may have affected his performance on intelligence testing. These factors included that Chase had been transferred to the facility in the very early morning, had vomited prior to the testing and had not been eating well, and was sleepy and fatigued during testing.

### b. Adaptive Behavior

¶43.    Regarding the adaptive behavior prong, Dr. Macvaugh testified that school records are one of the most important tools in assessing intellectual disability. He provided a detailed

24

review of Chase's educational history. Records from the Hazlehurst City School District showed that Chase failed tenth grade and dropped out of school during his second attempt to pass tenth grade. He had failed no other grades and lacked any history of special education services. In contrast with Dr. Reschly's finding that special education had not been available while Chase was in school, Dr. Macvaugh determined from his investigation that special education services had been available in Chase's school at least as early as 1980. He found it significant that Chase had never been referred for special education, although he admitted that not all intellectually disabled children are identified in school.

¶44. Dr. Macvaugh also found that Chase's grades were inconsistent with intellectual disability. Chase had made straight A's in the first grade and his grades continued to be above average until the sixth grade, when they began to decline, culminating in his failure of the tenth grade. In sixth grade, Chase was administered the California Achievement Test and scored in the twenty-second percentile; Dr. Macvaugh opined that this score was inconsistent with intellectual disability because an intellectually disabled person would be expected to score in the second percentile or below.

¶45. Dr. Macvaugh also found that Chase had given an average performance on the Weschler Memory Scale, which is inconsistent with intellectual disability, and he described how persons with intellectual disability demonstrate difficulty taking that test. On the WRAT-4, Chase demonstrated reading recognition skills at the tenth-grade level and spelling and arithmetic skills at the seventh-grade level. Dr. Macvaugh found Chase's WRAT-4 scores did not indicate intellectual disability. Additionally, Dr. Macvaugh found that the

25

vocabulary usage, speech patterns, and social skills Chase demonstrated at his interview at the state hospital were inconsistent with a person who suffers from intellectual disability. Dr. Macvaugh found that Chase's knowledge of football exceeded the abstract-thinking abilities of one with intellectual disability.

¶46. Dr. Macvaugh also reviewed Chase's employment history, which revealed employment for short periods of time. When Chase left school, he spent twenty-three months in the Job Corps in South Carolina. There, he learned welding and earned a welder's certificate. He then moved to Illinois and worked brief periods simultaneously at a plastic company and at a Wendy's restaurant. Chase said that he left Illinois when the weather turned cold. He returned to Hazlehurst and worked at Kitchens' Brothers Lumber Company for about two months. According to Dr. Pate's report, Chase left Kitchens' Brothers because the pay was low, the work was hard, and he could not satisfy his supervisor. Then, he got a job working for a construction company that was building a bridge and left when the job was complete. But Chase told Dr. Macvaugh that he worked on the bridge job as a welder for about three weeks and left because he had become overheated. Chase said that the longest period of time he had been employed was about three weeks. He reported that, between jobs, he earned extra income washing cars and doing yard work. Dr. Macvaugh found Chase's work history, including his work as a welder and his working at two jobs simultaneously, did not evince significant adaptive functioning deficits.

¶47. Dr. Macvaugh also reviewed Chase's history of substance abuse and criminal activity. Chase's correctional records indicated that he used alcohol and marijuana. Chase told Dr.

Macvaugh that he also had used cocaine, ecstasy, and speed. Chase told Dr. Macvaugh and Dr. Pate that he had helped steal a car as a teenager, and that he had been on probation. Chase also reported having been accused of breaking into stores. He was not sent to a training school or alternative school.

¶48.   Dr. Macvaugh admitted that it would have been preferable to have interviewed persons who had known Chase prior to age eighteen in the assessment of his adaptive functioning. He testified that members of the forensic team had attempted on several occasions to contact those persons, but that these attempts had been unsuccessful. However, Dr. Macvaugh opined that the failure to conduct interviews did not undermine his opinion. He opined that the information from interviews performed by Dr. Reschly lacked sufficient convergence to conclude that Chase had significant adaptive behavior deficits. Further, he opined that Dr. Reschly had used his own personal and moral judgment about what was normal rather than relying on nationally accepted standards.

¶49.   Dr. Macvaugh opined that Chase did not exhibit significant deficits in any domain of adaptive functioning. Dr. Macvaugh found that Chase's academic history, performance on the WRAT-R, and average performance on the Wechsler Memory Scale were inconsistent with the academic and conceptual skills of a person with intellectual disability. He found Chase's social behaviors to be inconsistent with intellectual disability. Dr. Macvaugh concluded from the totality of the information that, although Chase has some intellectual limitations, he is not intellectually disabled under *Atkins* and *Chase*.

    *3. Circuit Court's Holding*

¶50. The circuit court found that Chase had not proved by the preponderance of the evidence that he is intellectually disabled under *Atkins* and *Chase*. The trial court discounted Dr. O'Brien's testing result because he did not administer a test for malingering. The court found that Dr. Reschly had relied on his own personal opinions and moral judgment in concluding that Chase's behaviors equated with intellectual disability. The circuit court found Dr. Macvaugh's opinion to be more credible than those of Dr. Reschly.

## STANDARD OF REVIEW

¶51. On review of the trial court's decision after an evidentiary hearing on a post-conviction-relief motion, this Court will affirm the trial court's fact-findings unless they are clearly erroneous. *Goodin*, 102 So. 3d at 1111 (quoting *Doss v. State*, 19 So. 3d 690, 694)). We "must examine the entire record and accept 'that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's finding of fact . . . .'" *Goodin*, 102 So. 3d at 1111 (quoting *Doss*, 19 So. 3d at 694). This Court is to defer to the trial court as the "sole authority for determining credibility of the witnesses." *Goodin*, 102 So. 3d at 1111 (quoting *Doss*, 19 So. 3d at 694). Of course, questions of law are reviewed *de novo*. *Goodin*, 102 So. 3d at 1111 (quoting *Doss*, 19 So. 3d at 694).

## DISCUSSION

¶52. Chase raises several arguments on appeal that we have distilled into the following issues: (1) whether the circuit court committed errors of fact and law in finding that Chase had not proven significantly subaverage intellectual functioning; (2) whether the circuit court

28

committed errors of fact and law in finding that Chase had not proven significant deficits in adaptive functioning; and (3) whether the circuit court erred by denying Chase's motion for reconsideration without an evidentiary hearing to assess the credibility of those interviewed by Dr. Reschly.

> I. WHETHER THE CIRCUIT COURT ERRED BY FINDING THAT CHASE FAILED TO PROVE SIGNIFICANTLY SUBAVERAGE INTELLECTUAL FUNCTIONING.

¶53. The circuit court recognized that, to meet the first prong of the *Atkins*/*Chase* test for intellectual disability, Chase had to show significantly subaverage intellectual functioning. The circuit court found that Chase had a full-scale IQ score of 71 and that testing had shown he was not malingering. The circuit court found that "Chase's IQ testing scores of 71 fall within the range wherein mental retardation may be present in an individual, under certain conditions." The circuit court noted Dr. Macvaugh's testimony that a 71 IQ indicates borderline intellectual functioning, but that, due to the standard margin for error, an IQ score from 70-75 could indicate intellectual disability.

¶54. The circuit court concluded that Chase had presented sufficient evidence of significantly subaverage intellectual functioning to warrant consideration of his adaptive functioning. Then, the circuit court examined the evidence and found that Chase had not met the adaptive functioning prong. But, after analyzing adaptive functioning, the circuit court re-examined the evidence of subaverage intellectual functioning and questioned the validity of the 71 IQ score. The court noted that Dr. Perry had not given a malingering test, and that both Dr. Perry and Dr. Macvaugh had found Chase had not put forth his best effort during

29

testing. Relying on Dr. Macvaugh's testimony that Chase's scores on the WRAT-R and the Weschler Memory Scale were inconsistent with intellectual disability and that Chase's suboptimal performance could have negatively affected his test results, the circuit court "viewed [Chase's IQ score] as leaning towards the high mark of the range of standard deviation, not the lower." Therefore, the circuit court found that Chase had not met his burden of proof of significantly subaverage intellectual functioning.

¶55.     Chase first takes issue with the circuit court's holding that his full-scale IQ score was 71. He argues that the 2010 testing at the state hospital actually resulted in a full-scale IQ score of 70. He recognizes the testimony of Gugliano and Dr. Macvaugh that the testing showed that his full-scale IQ score was 72. He also recognizes that Gugliano testified that his score of 72 was adjusted to 71 due to the Flynn Effect. But he argues that testimony by Dr. Macvaugh establishes that his full-scale IQ actually was 70. Dr. Macvaugh testified that the WAIS-IV showed his full-scale IQ was 72, but that:

> in reviewing the raw scores since we did this evaluation, we have found one scoring error that changes the overall score to a 71. So we gave him a score that was higher on one item of one particular subtest than he should have been awarded, and we made an adjustment for that, and we believe that his correct score is 71, not a 72.

Dr. Macvaugh did not mention the Flynn Effect. Chase argues that, considering the point deducted for the subtest scoring error described by Dr. Macvaugh, along with the point deducted for the Flynn Effect described by Dr. Gugliano, the circuit court should have found that Chase's full-scale IQ score was 70, not 71. He further argues that he was prejudiced by this error because the trial court increased his burden of proof of adaptive functioning.

¶56. The circuit court did not clearly err by finding Chase's full-scale IQ to be 71. The state hospital's report stated that Chase's score was adjusted from 72 to 71 due to the Flynn Effect. Gugliano corroborated this adjustment in her testimony. Although Dr. Macvaugh testified that Chase's score was adjusted from 72 to 71 due to a scoring error in one of the subtests, neither the state hospital's report, which Dr. Macvaugh authored, nor Gugliano, who performed the testing, mentioned a scoring error. Thus, Dr. Macvaugh's description of a scoring error was not substantiated by either his own report or the testimony of the clinician who administered the test. The circuit court did not clearly err by relying on the state hospital's report and Gugliano's testimony to find that Chase's IQ score was 71.

¶57. Further, the circuit court did not increase Chase's burden of proof of adaptive functioning due to the 71 IQ score. The circuit court correctly identified that Chase's burden was to prove by a preponderance of the evidence that he had significant deficits in adaptive functioning. This is the same burden of proof that applies to a petitioner with an IQ score of 70; the petitioner must prove significant deficits in adaptive functioning that manifested prior to age eighteen. *Chase*, 873 So. 2d at 1027-29.

¶58. Next, Chase argues that he had proved significantly subaverage intellectual functioning as required by this Court's holding in *Goodin*. We agree. The state hospital report authored by Dr. Macvaugh concluded that Chase had a full-scale IQ of 71 and the TOMM did not indicate malingering. While the report noted that Chase's performance may have been compromised by his illness and fatigue, it also stated that "based on his scores on the malingering measure that we administered to him, there was no indication that Mr. Chase

31

was attempting to look more cognitively impaired than is actually the case." But at the hearing, Dr. Macvaugh distanced himself from his report's conclusion that Chase was not malingering. He stated that Chase's suboptimal performance during both his 1989 testing with Dr. Perry and his 2010 testing at the state hospital, along with his high vocabulary scores in 1989, threatened the validity of the test results. He believed that Chase had the ability to obtain a higher score.

¶59.     In *Chase*, we held that experts should use "any other tests and procedures permitted under the Mississippi Rules of Evidence, and deemed necessary to assist the expert and the trial court in forming an opinion as to whether the defendant is malingering." *Chase*, 873 So. 2d at 1028 n.19; *see also* ***Lynch v. State***, 951 So. 2d 549, 557 (Miss. 2007) (holding that trial courts may use any approved test to determine mental retardation and/or malingering). In *Goodin*, we held that a circuit court had erred by relying upon "unsupported allegations of malingering." In *Goodin*, Dr. O'Brien testified that he suspected Goodin of malingering. *Id.* at 1107. But two other experts found no evidence of malingering. *Id.* at 1108. Dr. Paul Deal testified that Goodin was malingering because his vocabulary usage, comprehension, and understanding at a mental evaluation varied the test results. *Id.* at 1109. However, he admitted that Goodin's score on the TOMM did not strongly suggest malingering. *Id.* at 1110. This Court held that the circuit court had clearly erred by relying on unsupported allegations of malingering. *Id.*

¶60.     *Goodin* stands for the proposition that a circuit court should not rely on unsupported testimony of malingering at variance with the results of malingering tests. We find that Chase

32

met his burden of proof of subaverage intellectual functioning.

¶61.    Chase also complains that the circuit court erroneously gave more weight to Dr. Macvaugh's testimony that Chase's 71 IQ score was not reflective of his actual ability than to Gugliano's testimony that his score was in the range for intellectual disability. Because we hold that Chase proved subaverage intellectual functioning, we need not address this issue.

>    II. WHETHER THE CIRCUIT COURT ERRED BY FINDING THAT CHASE FAILED TO PROVE SIGNIFICANT DEFICITS IN ADAPTIVE FUNCTIONING.

¶62.    Chase argues that the circuit court committed errors of fact and law in its finding that he had failed to prove significant deficits in adaptive functioning. As we have held, the adaptive functioning prong requires that the petitioner show significant deficits in one of the adaptive functioning domains identified in the 2010 AAIDD and 2013 APA definitions of intellectual disability, or, under the *Atkins*/*Chase* definitions, show significant deficits in two or more adaptive functioning areas. Dr. Reschly testified that Chase had significant deficits in all three adaptive functioning domains under the 2010 AAIDD definition and significant deficits in seven adaptive functioning areas under the *Atkins*/*Chase* definitions. Dr. O'Brien found that Chase had significant deficits in the conceptual and practical domains under the 2010 AAIDD definition. And Dr. Macvaugh found that Chase lacked significant deficits in any area of adaptive functioning. After reciting the evidence of adaptive functioning, the circuit court found the opinions of Dr. Macvaugh to be most persuasive. The circuit court found that Dr. Reschly's opinions were unpersuasive because many of his conclusions were grounded in his own personal opinions and moral judgments and did not have a substantial

scientific basis.

¶63.    Chase argues that the circuit court erroneously found that Dr. Reschly did not rely on any methodology to assure the interview sources' credibility. He also argues that the circuit court's decision contravened **Goodin** by relying on Dr. Macvaugh's testimony that Chase's vocabulary usage and score on the Wechsler Memory Scale were inconsistent with intellectual disability. Chase contends that our holding in **Goodin** necessitates the use of interviews in the assessment of adaptive functioning and that the circuit court was bound to accept the findings of Dr. Reschly. He argues that the circuit court clearly erred by finding Dr. Reschly's opinions were not credible. He also argues that **Goodin** requires a retrospective analysis of adaptive functioning and the trial court erred by accepting Dr. Macvaugh's conclusions because they relied on Chase's present abilities. Finally, Chase argues that the circuit court's finding that he had failed to meet the adaptive functioning prong was clearly erroneous.

¶64.    As an initial mater, we agree with Chase that the circuit court clearly erred by finding that Dr. Reschly used no methodology to assure the credibility of the interview sources. In fact, Dr. Reschly testified that he had used the convergent validity principle[2] to assess the credibility of the sources. However, that error was of little import to the circuit court's holding. It is manifest from the circuit court's opinion that the primary reason it found Dr. Reschly's opinions unpersuasive was that Dr. Reschly relied on his own personal opinions and moral judgments rather than on science. The trial court found Dr. Reschly's opinions to

---

[2] According to the testimony, that principle holds that consistency across multiple sources tends to show that the sources were telling the truth about what they observed.

34

be "replete with instances of attributing deficits easily and based on personal beliefs, not science."[3]

¶65.   We turn to Chase's argument that *Goodin* required the trial court to accept the opinions of Dr. Reschly. Chase's argument, and that of the dissent, misinterprets *Goodin* to hold that a trial court *must* credit the conclusions an expert draws after interviewing family, friends, and educators in a retrospective analysis of adaptive functioning. *Goodin* stated the following regarding retrospective analysis of a defendant's adaptive functioning:

> Mental retardation in the *Atkins* context must therefore be diagnosed, if it is to be diagnosed at all, retrospectively . . . . This Court has noted the importance of interviewing family and friends knowledgeable about the defendant's past. Interviews with educators or others in the community familiar with the defendant's behavior before age eighteen also would provide valuable information. Adaptive functioning tests may be administered to these individuals as well. A retrospective evaluation also could include a thorough review of school records, social history, and work history, among other things.

*Goodin*, 102 So. 3d at 1115 (citations omitted). While *Goodin* held that interviews could be valuable evidence, this Court did not deprive the circuit court of its fundamental role in evaluating the credibility of the conclusions the expert draws from the interviews. We reject Chase's invitation to enact a rule that a circuit court must blindly accept a psychologist's interpretation of witnesses' answers to interview questions as dispositive of the adaptive functioning prong of the test for intellectual disability. We hold that the circuit court was entitled to evaluate the scientific validity and credibility of Dr. Reschly's opinions and to

---

[3] Contrary to the dissent's position, the trial court did not find Dr. Reschly's opinions less credible due to "inherent bias" of the sources. In fact, the trial court never stated that the interview sources were "inherently biased." The trial court's primary reason for discounting Dr. Reschly's opinions was its finding that many of his conclusions were not grounded in science, but in his own personal opinions and moral judgments.

reject them if it found them not credible. *Id.* at 1111.

¶66.    The circuit court did not clearly err by rejecting the testimony of Dr. Reschly. Dr. Reschly performed no testing of Chase, preferring to rely on the 2010 testing performed by the state hospital and the battery of tests performed in 1989 by Dr. Perry. Dr. Reschly interviewed Chase and conducted interviews of Chase's family, friends, and educators who knew him prior to age eighteen. Because Dr. Reschly performed no testing, his conclusions about Chase's abilities were based on his review of others' testing and his interpretation of the significance of the sources' descriptions of Chase's behavior. The circuit court found that Dr. Reschly's conclusions about Chase's behavior were based largely on personal opinions and moral judgment, not science. The circuit court cited several of Dr. Reschly's opinions which it found not credible. We discuss each of the circuit court's findings in turn.

¶67.    The circuit court held that Dr. Reschly had relied on his personal beliefs when he found that Chase demonstrated a significant deficit in social responsibility by unknowingly fathering a child out of wedlock. This finding was fully supported by Dr. Reschly's admission at trial that this opinion was based on his own moral judgment of Chase's behavior. Dr. Reschly also assigned an adaptive deficit to Chase's statement during his interview that he washes salt off prepackaged noodles. Dr. Reschly found this demonstrated an adaptive deficit because washing salt off noodles is impossible. The circuit court found this to be "an insufficient and ungrounded basis for finding a deficiency, but an action [washing salt off noodles] that is entirely possible." The circuit court further found that Dr. Reschly used his own personal judgment in determining that Chase told made-up stories to

36

mask his intellectual deficiency, and that Dr. Reschly "simply decided himself what was and was not possible."

¶68. Dr. Reschly's report indicates that, except for Chase's story of being suspended for having sex on school property, which Dr. Reschly verified was untrue after talking to his teacher, Dr. Reschly's opinions about the veracity of Chase's descriptions of past incidents were entirely subjective. The circuit court found that Dr. Reschly's finding that Chase was lying when he said he had been knocked out when he hit his head on a basketball rim at age twelve or thirteen was not credible. The circuit court found that Dr. Reschly simply assumed this event was implausible without asking followup questions. The circuit court found that Dr. Reschly's assignment of deficits to Chase due to his short work history and the fact that his mother still bought him clothes and gave him money was not credible because Dr. Reschly failed to take into consideration the fact that Chase was ages sixteen through nineteen during this time. The circuit court found that, while Dr. Reschly found that certain statements Chase had made during the interview were illogical or untrue, his only basis for that conclusion was his own personal unfamiliarity with Chase's linguistic expressions. The circuit court also noted Dr. Reschly's conclusion that Chase's chronic lateness demonstrated an adaptive deficit in the area of time concepts. Dr. Reschly testified that Chase's chronic lateness showed he had problems telling time, but Dr. Macvaugh testified that this conclusion was erroneous. These credibility decisions are entrusted to the circuit court under our standard of review.

¶69. The circuit court also found unpersuasive Dr. Reschly's opinion about Chase's

37

understanding of his liability for capital murder. Dr. Reschly stated:

> Mr. Chase's language and thinking limitations are revealed in a comment by Dr. Pate in 1989, quoted in the MS State Hospital Report: "He does not want to die but hates that he has no future because of something he didn't do." Clearly Mr. Chase failed then and now to understand his culpability as someone who admitted to assisting and encouraging a crime that caused a murder. (Ricky Chase's Trial Testimony, 1990). Culpability is an abstract idea, involving understanding the relationship among several elements. Such language and abstract thinking deficits are at the heart of the exclusion of the death penalty with persons with mental retardation.

The circuit court was unpersuaded by this opinion because Chase demonstrated an understanding of his criminal liability. The circuit court stated that "certainly accomplice liability is an area which many people, even those with legal training, often do not fully understand and certainly an argument by Chase that as the non-triggerman in a murder equals less culpability is not so easily categorized as deficient." This finding was fully supported by the law and the record. Under ***Enmund v. Florida***, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982), and ***Tison v. Arizona***, 481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987), to be sentenced to death, a person convicted of capital murder actually must have killed, attempted to kill, intended to kill, or intended that lethal force be used in a felony. Chase consistently maintained at his sentencing hearing that his participation in the robbery and murder were wrong, but that, because he did not fire the fatal shot or intend the murder, he should not receive the death penalty. He stated:

> I was wrong. I was just as much involved in it as he was. I was wrong for being there and I was wrong for taking a part in it, because I knew it was wrong, it was dead wrong. What I'm saying is, to the Judge, the DA, the Court, the Grand Jury, is that I'm not the one who shot Mr. Hart. I didn't kill him. I was there and I was wrong for being there, but I didn't kill him.
> . . .

38

I'm not ready to pay the price for nothing, but I broke the law and I know I have to be punished for me taking my part in that murder, but I don't feel like – I don't feel like, in fact, I know that I shouldn't be punished for what I'm charged with, because I didn't commit the crime, although sometimes someone shoots a person and they're right there with him, they're just as guilty as he is.

. . .

I was just as guilty as he is, but I didn't pull the trigger that killed Mr. Hart. I did not fire the shot. I did not fire the shot that killed Mr. Elmer Hart.

The circuit court reviewed the same medical history and trial transcripts as Dr. Reschly and was entitled to find that Chase's statements did not justify Dr. Reschly's conclusions about Chase's understanding of his criminal liability.

¶70.    We recognize an additional deficiency in Dr. Reschly's opinions not identified by the circuit court. Citing the 2010 AAIDD manual, Dr. Reschly's report indicated that adaptive behavior is evaluated through the use of standardized measures. He quoted the manual's directive that significant adaptive functioning deficits are assessed in the following manner:

For the diagnosis of intellectual disability, significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population, including people with disabilities and people without disabilities. On these standardized measures, significant limitations in adaptive behavior are operationally defined as performance that is approximately two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills. The assessment instrument's standard error of measurement must be considered when interpreting the individual's obtained scores.

*Intellectual Disability: Definition, Classification, and Systems of Support* 43 (11th ed. 2010).

Yet Dr. Reschly used no normed data to evaluate the results of the interviews he conducted. Instead, he relied on his own personal opinions and clinical judgment as to what the information he gathered meant. We find that, without reference to a standardized measure

39

normed on the generalized population, Dr. Reschly's conclusions lacked the sound scientific basis demanded in the context of an *Atkins* evaluation. Dr. O'Brien's opinions suffered from the same deficiency. We find that the circuit court did not clearly err in rejecting the conclusions of Dr. Reschly and Dr. O'Brien.

¶71.   We turn to the circuit court's reliance on Dr. Macvaugh's findings. Dr. Macvaugh performed a retrospective analysis as required by *Goodin*. He reviewed Chase's school records, including his transcripts from the Hazlehurst City School District, his attendance records, and the results of standardized achievement testing and aptitude testing, all from before Chase attained the age of eighteen. He also reviewed Chase's employment history, the psychological testing performed by Dr. Perry in 1989, when Chase was twenty, and a report by Dr. Ray Pate dated February 14, 1990. During the 2010 assessment of Chase at the state hospital, Dr. Macvaugh interviewed Chase and assessed his performance on the WRAT-4, which measures spelling, mathematics, and reading recognition. Based on all of this evidence, Dr. Macvaugh opined that Chase had no significant deficits in any area of adaptive functioning.

¶72.   We reject Chase's argument that the the circuit court erred by relying on Dr. Macvaugh's findings that Chase's scores on the Wechsler Memory Scale and his vocabulary usage at the interview were inconsistent with intellectual disability. Chase cites *Goodin*'s statement that the overwhelming evidence of Goodin's intellectual disability could "not be discounted by the assertion that he is too adept at using language . . . ." While *Goodin* indicated that an assertion that an individual's language skills alone cannot outweigh other

40

overwhelming evidence of intellectual disability, it did not hold that indicators such as vocabulary usage and memory can never factor into a legal determination of intellectual disability. Dr. Macvaugh's findings of no intellectual disability did not solely rest upon Chase's vocabulary usage and memory, but took copious other evidence into consideration. The circuit court did not err by relying on Dr. Macvaugh's statements about Chase's vocabulary usage and memory because those were but two facets of his overall assessment of Chase's condition.

¶73. Nonetheless, Dr. Macvaugh's conclusions exhibited the same deficiency we identified in Dr. Reschly's testimony. Dr. Macvaugh's opinions about Chase's abilities rested solely upon his clinical judgment, with no reliance on normed data, with the exception of the WRAT-4, which measures only spelling, mathematics, and reading recognition. Certainly, reliance on clinical judgment is warranted in the area of adaptive functioning. *See Doss*, 19 So. 3d at 713 (stating that "[a]daptive functioning historically has been assessed 'on the inherently subjective bases of interviews, observations, and professional judgment'"); *Hardy*, 762 F. Supp. 2d at 883 (stating that "[t]he evaluation of a person's adaptive functioning involves significantly more subjective clinical judgment. That judgment is still constrained to some extent by the criteria spelled out by the APA and AAMR/AAIDD, as well as the use of standardized tests"). But Dr. Macvaugh himself recognized the important role of normed data to evaluate intellectual disability, even in the context of a death-row inmate attempting to meet the *Atkins* standard. In a peer-reviewed article by Dr. Macvaugh that was admitted into evidence in this case, Dr. Macvaugh stated the following regarding *Atkins* evaluations

of incarcerated individuals:

> [I]nformation regarding adaptive function[ing] is most reliably obtained through the descriptions of third parties who have had the opportunity to closely observe the examinee in the community. The individual under evaluation is not the most reliable source of information regarding his own adaptive functioning. [*A]ppraisal of the adaptive quality of behavior is most reliably based on comparison of described behavior with that of a normative group (e.g., standardized adaptive behavior rating scales).*

Macvaugh, G.S. & Cunningham, M.D., *Atkins v. Virginia: Implications and Recommendations for Forensic Practice*, 37 J. of Psychiatry & the Law, 131, 168 (2009) (emphasis added). Despite his article's emphasis on the importance of using normed data, Dr. Macvaugh did not follow the procedures he advocated in his assessment of Chase.[4] We find that none of the experts in this case conducted nearly the depth of investigation appropriate for assessing intellectual disability for the purposes of *Atkins*. Nonetheless, the burden of proof rested with Chase. The circuit court did not clearly err by rejecting the opinions of Dr. Reschly and Dr. O'Brien and finding that Chase had failed to prove intellectual disability by a preponderance of the evidence.

> III.  WHETHER THE CIRCUIT COURT ERRED BY DENYING CHASE'S MOTION FOR RECONSIDERATION WITHOUT AN EVIDENTIARY HEARING TO ASSESS THE CREDIBILITY OF THE PERSONS INTERVIEWED BY DR. RESCHLY.

¶74.  Chase timely filed a motion for reconsideration, raising numerous issues. In the motion, Chase noted the circuit court's recognition of Dr. Macvaugh's testimony that he had

---

[4] The 2010 AAIDD manual explains that, infrequently, standardized assessments cannot be used and provides guidelines for that scenario. *Intellectual Disability: Definition, Classification, and Systems of Support* 48 (11th ed. 2010). No expert in this case provided an explanation for why he did not use standardized assessments.

42

wanted to interview the third parties interviewed by Dr. Reschly, but he had been unable to contact them. Chase requested that the circuit court reopen the hearing, take additional testimony from these third parties, and make new findings of fact and conclusions of law.

¶75. Chase filed his "motion for reconsideration" under Mississippi Rules of Civil Procedure 59(e) and 52(b). We have held that a "motion for reconsideration" is treated as a motion to alter or amend the judgment under Rule 59(e). **Brooks v. Roberts**, 882 So. 2d 229, 233 (Miss. 2004). Rule 59(e) states that "[a] motion to alter or amend the judgment shall be filed not later than ten days after entry of the judgment." Rule 52(b) states, in pertinent part:

> **(b) Amendment.** Upon motion of a party filed not later than ten days after entry of judgment or entry of findings and conclusions, or upon its own initiative during the same period, the court may amend its findings or make additional findings and may amend the judgment accordingly. The motion may accompany a motion for a new trial pursuant to Rule 59.

M.R.C.P. 52(b). Neither Rule 59(e) nor Rule 52(b) contemplates reopening the judgment to take additional testimony and amend the judgment. That procedure is embraced by Rule 59(a), which governs motions for a new trial and states that "[o]n motion for a new trial in an action without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment." M.R.C.P. 59(a). *See **Graves v. Dudley Maples, L.P.***, 950 So. 2d 1017 (Miss. 2007) (stating that "[t]he proper method to address any concerns about evidence [is] through a motion for a new trial pursuant to M.R.C.P. 59"); ***Street v. Street***, 936 So. 2d 1002, 1008 (Miss. Ct. App. 2006) (stating that

"the timing of a Rule 59(e) motion to alter or amend a judgment and a Rule 59(a) motion for a new trial is identical; both motions must be made 'not later than ten days after the entry of judgment'") (quoting M.R.C.P. 59(b)).

¶76. We review Chase's request for the circuit court to reopen the judgment, take additional testimony, and amend the judgment as a motion for a new trial under Rule 59(a). The denial of a motion for a new trial is reviewed for abuse of discretion. *Rogers v. Morin*, 791 So. 2d 815, 820 (Miss. 2001). In his motion, Chase argued that the case should be reopened to allow Dr. Macvaugh to interview the third parties or to allow them to testify. On appeal, Chase argues that the circuit court should have reopened the proceedings to hear testimony from the third parties. Dr. Macvaugh testified that, while he would have preferred to conduct interviews, he had sufficient information with which to reach a conclusion on the question of whether Chase was intellectually disabled. Dr. Macvaugh believed his evaluation of Chase to be complete, and there is no indication that hearing testimony from the third parties would have caused Dr. Macvaugh to revisit his opinions. The trial court did not abuse its discretion by denying Chase's motion for a new trial.

## CONCLUSION

¶77. We affirm. The circuit court did not clearly err by finding that Chase had failed to prove intellectual disability by a preponderance of the evidence, and it did not abuse its discretion by denying Chase's motion for a new trial. We hold that the definitions of intellectual disability promulgated by the American Association on Intellectual and Developmental Disabilities in 2010 and the American Psychiatric Association in 2013 may

44

be used in our courts in determining whether a criminal defendant is intellectually disabled for the purposes of the Eighth Amendment.

¶78.   **AFFIRMED.**

**RANDOLPH, P.J., LAMAR, PIERCE AND COLEMAN, JJ., CONCUR. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND KING, J. KITCHENS, J., NOT PARTICIPATING.**

**DICKINSON, PRESIDING JUSTICE, DISSENTING:**

¶79.   I dissent for two reasons. First, under our current ***Atkins*** law and procedure, the circuit judge failed to follow this Court's precedent, applied a flawed ***Atkins*** standard, and incorrectly found that Chase is not intellectually disabled and exempt from execution.[5] Second, this and other recent ***Atkins*** cases have convinced me that our existing ***Atkins*** standard and procedures are inadequate to alleviate the Eighth Amendment concerns implicated when an intellectually impaired offender faces potential capital punishment.

**I.     The circuit court applied a flawed legal standard.**

¶80.   The circuit judge discredited Dr. Reschly's testimony for doing exactly what this Court has instructed him to do. Dr. Reschly relied on interviews with Chase's family and teachers. Our decision in ***Goodin v. State*** established that those interviews are an important component in a retrospective ***Atkins*** evaluation.[6] So, clearly, the circuit judge disregarded our precedent and employed a flawed legal standard that required Dr. Reschly to base his

---

[5] ***Atkins v. Virginia***, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002); ***Chase v. State***, 873 So. 2d 1013 (Miss. 2004).

[6] ***Goodin v. State***, 102 So. 3d 1102, 1115 (Miss. 2012) (quoting ***Doss v. State***, 19 So. 3d 690, 714 (Miss. 2009)).

opinions on the circuit judge's own subjective standards.

¶81.    To fully appreciate this error, one must view it in light of the circuit judge's ruling as a whole.  The circuit judge found that Chase failed to meet his burden to show the existence of adaptive functioning deficits.  Why?  Not because the circuit judge found the State's evidence more convincing.  Instead, for at least one legally invalid reason, he discredited Dr. Reschly's findings and rejected them wholesale.

¶82.    The circuit judge reached that conclusion largely because Dr. Reschly relied on interviews with Chase's family, teachers, and others who knew him prior to age eighteen to assess Chase's adaptive functioning.  The circuit judge found such sources inherently biased, and, in turn, found Dr. Reschly's acceptance of their statements biased.  He also found that Dr. Reschly's report failed to present a methodology for questioning those witnesses.

¶83.    The circuit judge's inherent distrust of these sources sits in stark contrast to professional standards, and to our precedent which specifically endorses interviews with family and others who knew the accused prior to age eighteen.  In *Goodin*, this Court stated that "because the definitions of mental retardation require onset before age eighteen, when evaluating anyone over the age of eighteen—incarcerated or not—some type of retrospective analysis must be employed."[7]  To that end, we stated:

> This Court has noted the *importance of interviewing family and friends* knowledgeable about the defendant's past. *Interviews with educators or others in the community familiar with the defendant's behavior before age eighteen also would provide valuable information*. Adaptive-functioning tests may be administered to these individuals as well. A retrospective evaluation also could

---

[7] *Goodin*, 102 So. 3d at 1114 (citing *Thorson v. State*, 76 So. 3d 667, 672 n.8 (Miss. 2011)).

46

include a thorough review of school records, social history, and work history, among other things.[8]

¶84. So this Court has acknowledged that family, friends, and educators are important resources to assess adaptive functioning. The circuit judge disregarded that principle of law when he found those sources inherently biased, especially given that the record lacks any indication that any witness lied. Simply put, the circuit judge's ruling was not based on any finding that a particular witness was biased, but rather on a finding that statements from this particular class of witnesses were biased and unreliable. This was legal error.

¶85. To be sure, our precedent does not require the circuit judge automatically to accept all information derived from family members, teachers, and friends from the past. But our precedent does preclude a finding that information from such sources is inherently unreliable.

¶86. Further, the circuit judge simply was incorrect when he found that Dr. Reschly provided no methodology for judging the credibility of those informants. In his report, Dr. Reschly explained that the primary measure of credibility for third-party informants is the convergent validity principle, a recognized principle that was unchallenged by the State. The examiner must look for consistency in the information received from multiple sources or through multiple methods to justify his reliance on that information. And, in the evidentiary hearing, Dr. Reschly testified that he observed that consistency across his sources. This too was error, which the majority concedes along its road to affirm. And these errors are compounded by the fact that the circuit judge readily accepted Dr. Macvaugh's opinions, despite the fact that Dr. Macvaugh never conducted a single third-party interview, which we

---

[8] *Goodin*, 102 So. 3d at 1115 (citing *Doss*, 19 So. 3d at 714) (emphasis added).

47

deemed so vital in *Goodin*.

¶87.   Also, Dr. Reschly found evidence of a lack of social responsibility in Chase's claim that he had reason to believe he had fathered a child with an unknown woman.  The circuit judge—with no basis in scientific literature or expert opinion to support his conclusion—found that this was not appropriate scientific evidence of an adaptive functioning deficit.  I do not wish to be misunderstood on this point.  The circuit judge did not find one expert more credible than another.  He simply disagreed with a scientific principle stated by Dr. Reschly, a professor of psychology at Peabody College of Vanderbilt University; a permanently licensed school psychologist in Arizona and Iowa with a bachelor's degree from Iowa State University, master's degree from the University of Iowa, and Ph.D. from the University of Oregon; having studied in the field of intellectual disability "particularly the psychological aspects of mental retardation systematically since 1967;" and having been active in the American Psychological Association's division devoted to developmental disabilities and intellectual disabilities "for about twenty years."

¶88.   Further, the circuit judge simply was incorrect when he attacked Dr. Reschly's finding that Chase fabricated stories about sexual exploits to appear normal because "he did not appear to corroborate any of these allegedly 'made up stories,' but rather simply decided himself what was and wasn't possible."  Contrary to the judge's assertion, both Dr. Reschly's report and his testimony explain that he confirmed that Chase had never been expelled from school for having sex on campus as he claimed by asking one of Chase's teachers and his principal.

48

¶89. The circuit judge also criticized Dr. Reschly's use of Chase's mistaken belief that he is not culpable for his crime because accomplice liability is, in the judge's view, a difficult subject to understand "even [for] those with legal training." But Dr. Reschly did not find a deficit in Chase's failure to understand the nuance of his culpability as an accomplice, but rather Chase's view that he had done nothing wrong despite the fact that he had admitted to assisting and encouraging a murder. As Dr. Reschly explained, understanding culpability requires abstract reasoning, and the absence of that reasoning indicates an adaptive functioning deficit.

¶90. Similarly, the circuit judge found that "Dr. Reschly assigned deficits to Chase's fairly short work history, and that his mother still bought him clothes and gave him money. However, he did not believe it relevant to this finding that Chase was 16-19 through his work history." But in actuality, Dr. Reschly found that Chase's work history evidenced an adaptive functioning deficit not because it was short, but because he concluded that Chase repeatedly had lost jobs because of his inability to perform his job functions. And Dr. Reschly focused not on the fact that Chase's mother bought clothes for him, but on the fact that he was "excessively dependent on Mrs. Chase, who carefully directed and monitored Mr. Chase's dress, hygiene, and grooming." For example, she had to select his clothing for him when he was in high school.

¶91. Further, the circuit judge's troubled attempt to apply our *Atkins* standard extended to his analysis of the first criterion: subaverage intellectual functioning. As the majority concludes, "the circuit court clearly erred by crediting Dr. Macvaugh's unsupported

49

allegations of malingering that conflicted with the results of the TOMM and by finding that Chase had failed to meet his burden of proof of significantly subaverage intellectual functioning."

¶92. In sum, the circuit judge discredited Dr. Reschly's testimony wholesale, largely because Dr. Reschly relied on sources of information that this Court has found important in *Atkins* evaluations. That was legal error. And the trial judge compounded his error by undermining Dr. Reschly's scientific analysis with rebukes that were unsupported in the evidence. Because of this error, we should reverse the circuit judge's ruling and, at a minimum, remand this case to the circuit judge for new findings.

## II. Chase is intellectually disabled.

¶93. Though the circuit judge's legal error requires reversal, our inquiry cannot stop there, because Chase contends that the overwhelming weight of the evidence shows that he is intellectually disabled and exempt from execution. Under our current caselaw, Chase bore the burden to prove by a preponderance of the evidence that he has subaverage general intellectual functioning evidenced by an IQ of seventy-five or lower (criterion 1); significant limitations in adaptive functioning in two or more of the areas of communication, self-care, community use, self-direction, health and safety, functional academics, leisure, and work (criterion 2); and manifestation prior to age eighteen (criterion 3).[9] In my opinion, the overwhelming weight of the evidence shows that Chase met that burden.

*Criterion A*

---

[9] *Chase*, 873 So. 2d 1027-28.

¶94. To establish the first criterion, Chase had to show that he possesses subaverage intellectual functioning.[10] A petitioner's intellectual functioning is measured in terms of IQ and defined as a full-scale IQ at or below 75.[11] A showing must also be made that the petitioner was not malingering during testing—that is, intentionally scoring lower than he is capable of scoring to obtain a secondary gain.[12]

¶95. Chase has been administered two IQ tests. In 1989, Chase took the Wechsler Adult Intelligence Scale Revised and scored a full-scale IQ of 71. In 2010, Chase took the Wechsler Adult Intelligence Scale Fourth Edition and obtained a corrected full-scale IQ of 71. Dr. Reschly explained that Chase was given a test to measure malingering with the 2010 exam, and that the test showed no indication of malingering. These facts were undisputed in the evidentiary hearing. So Chase indisputably established the first criterion.

*Criterion B*

¶96. Chase next had to establish the existence of two or more adaptive functioning deficits.[13] This prong has been satisfied as well.

*Communication*

¶97. During his interview with Chase, Dr. Reschly found Chase's use of language "repetitive, rambling, directionless, and without clear purpose." He noted that Chase often

---

[10] *Id.* at 1028.

[11] *Id.*

[12] *Id.*

[13] *Id.*

failed to complete sentences or rambled across several unrelated topics in a single sentence. This made his speech difficult to follow. Dr. Reschly also found that Chase would make illogical or improbable statements. One example is Chase stating: "My sister, you gotta catch her, she works all the time, like a kangaroo." Dr. Reschly explained that Chase's difficulties with language were closely related to his limited abstract reasoning. And people who knew Chase during high school explained that he frequently would fail to understand the content of a conversation.

¶98. Chase possesses very basic literacy in the twentieth percentile. Dr. Reschly opined that scoring in the twentieth percentile does not exclude a diagnosis of intellectual disability. Dr. Macvaugh opined that intellectually disabled individuals usually do not score that high. But Dr. Reschly found that Chase's actually functioning fell short of the literacy levels his test scores revealed. He explained that Chase's reading and writing were above average for a person with an intellectual disability, but significantly below an average person. For instance, several people claimed that Chase struggled to read and understand simple instructions, like those on a macaroni box.

¶99. The state hospital also administered the Wide Range Achievement Test, Revision Four. On that test, Chase scored in the nineteenth percentile—9.6 grade equivalent—in word reading; the eighteenth percentile—10.4 grade equivalent—in sentence comprehension, the twenty-fifth percentile—10.3 grade equivalent—in spelling; the tenth percentile—5.7 grade equivalent—in math computation, and the fourteenth percentile reading composite score.[14]

---

[14] I stop here to note that the majority incorrectly concludes that the experts in this case failed to employ sufficient normed data in their respective adaptive functioning

52

¶100. Given this overwhelming evidence, I would find that Chase established an adaptive functioning deficit in communication.

*Self-Care/Self-Direction/Home-Living*

¶101. Chase's mother reported that Chase always had struggled to understand directions. She explained that he needed more supervision than her other children and that he had to be guided directly. Chase expressed that he depended on the judgment of his girlfriend to make good decisions and keep him out of trouble. In fact, Chase's mother directed and monitored his hygiene and grooming. Even in high school, his mother had to pick out his clothes for him. And a friend reported that Chase once attempted to cut his own hair, resulting in it looking bad, but he was oblivious about how bad it looked.

¶102. Chase's mother reported that he was difficult to toilet train, and that he reached most early-childhood-development landmarks later than her other children. Chase explained that, while incarcerated, he washes his clothes in his cell toilet instead of using the prison laundry or the sink in his cell. Chase also admitted that he cannot keep up with his prison commissary account. Chase also suffers from high blood pressure, but he refuses to take his blood-pressure medication because he believes that he will become dependent on it. Chase has also, while incarcerated, attempted suicide by hanging in his cell. None of this evidence was refuted. So, I would find that Chase also established a deficit in this area.

analyses. Each relied on the normed results of the Wide Range Achievement Test. What is more, the majority imposes a new legal requirement on *Atkins* evaluations—that every evaluation must, as a matter of law, include normed tests—which did not exist when Chase prepared for the evidentiary hearing in this case. If the majority wishes to impose this new legal requirement, due process demands that Chase be given an opportunity to present that evidence in a new evidentiary hearing.

*Social/Interpersonal Skills*

¶103. People interviewed by Dr. Reschly reported that Chase often told improbable stories to fit in socially. Dr. Reschly explained that Chase used these stories to cover up his failures, such as explaining that he was expelled from school for having sex when he actually dropped out because of his academic struggles. People who knew Chase in high school reported that Chase would continue to tell those stories, despite a negative reaction from his peers. And Chase had little interaction with his peers during his teen years, preferring to interact with children younger than himself.

¶104. People who knew Chase from his school years suggested that he stuck out because he was so intellectually slow. Chase often gave money away in what one person described as an attempt to buy friends. And several people reported that Chase was often easily led into trouble by others. Dr. Reschly opined that Chase struggled to understand social responsibility. Chase's civics teacher reported that Chase received an F in his class because he could not understand the basic obligations of a citizen. Chase also believes he may have fathered a daughter with a woman he does not know. So Chase established an adaptive functioning deficit in the absence of contrary evidence.

*Functional Academic Skills*

¶105. Chase struggled in school as a child. His teachers reported that he needed a great deal of help and had difficulty understanding abstract information. Several teachers stated that Chase needed to be in special education, but was not, because special education classes were not available while he was in school. But Dr. Macvaugh confirmed with Hazelhurst Schools

54

that special education became available in 1985, the year Chase dropped out. His teachers also explained that, despite the fact that Chase gave good effort in school, he was unable to understand things that the other children could. Chase was described as one of the lowest students in his classes and received mostly Ds and Fs in his later school years.

¶106. Chase's transcript reveals that, while he progressed through school grades, his performance continually dropped. Dr. Reschly explained that this is a common characteristic of those with intellectual disability. Chase was retained in the tenth grade and dropped out of school during the second nine weeks of his second tenth-grade year. Dr. Macvaugh opined that intellectually disabled individuals usually do not reach the tenth grade. Dr. Reschly noted that in the ninth grade, Chase obtained only three and a half out of a potential six to eight credits toward graduation, and in tenth grade none at all. I would find that the evidence shows a deficit in this area.

*Work*

¶107. In his high-school trade class, Chase struggled to use basic tools like saws, chisels, and hammers. He would attend that class and watch others work, but he never completed any projects himself. Chase's girlfriend's mother reported that, at age sixteen, Chase could not change a lightbulb for her. According to his social security records, from January 1985 until December 1989, Chase had eight different jobs and earned less than three hundred dollars from six of those. Several people explained that Chase often lost those jobs because he could not adequately perform his duties. This undisputed evidence establishes an adaptive functioning deficit in this area.

¶108. Based on this evidence, Dr. Reschly opined that Chase had the necessary adaptive functioning deficits to satisfy the second prong of *Chase*. Dr. O'Brien agreed. Employing our *de novo* review in light of the circuit judge's legal error, we agree and find that Chase's largely undisputed evidence established two or more adaptive functioning deficits by a preponderance of the evidence. Though Dr. Macvaugh disagreed with that conclusion, he did so without the benefit of the necessary third-party interviews from Chase's developmental years, which present most of the evidence of adaptive functioning deficits. So Chase satisfied the second prong.

*Criterion C*

¶109. Finally, Chase had to establish that his deficits manifested prior to age eighteen.[15] All of the third-party informants whom Dr. Reschly interviewed knew Chase prior to that age. Further, the experts in this case relied on information from Chase himself, describing conduct from before age eighteen. Finally, while the experts disputed whether Chase had adaptive functioning deficits, no expert ever suggested that he had deficits that manifested later than age eighteen. So I would conclude that the undisputed evidence shows that Chase's adaptive functioning deficits manifested prior to age eighteen.

¶110. Because I believe that the overwhelming weight of the evidence shows that Chase satisfied all three prongs of the *Chase* criteria, I would find that he is intellectually disabled and exempt from execution.

### III. Our Flawed *Atkins* Standard

---

[15] *Chase,* 873 So. 2d at 1028.

¶111. While the foregoing explanation expresses my belief that the record shows that Chase was entitled to relief under our current *Atkins* standard, the record in this case also reveals a far more pernicious concern. None of the dispute between the experts at trial, the parties on appeal, or between the majority opinion and this dissent bears any relevance to the Eighth Amendment concerns which significantly guided the *Atkins* decision and required this Court to adopt an *Atkins*-related standard and procedure in the first place. I am concerned that neither the experts, nor the circuit judge, nor the parties, nor this Court has considered the appropriate Eighth Amendment questions. For that reason, I have come to believe new *Atkins* standards may be needed.

¶112. When the *Atkins* court exempted the intellectually disabled from execution under the Eighth Amendment to the United States Constitution, it did so based in part on specific concerns related to the diminished capacity of those offenders, and their relation to the judicial process.[16] The Court noted the risk of "false confessions;" a lesser ability on the part of the offender to "make a persuasive showing of mitigation in the face of the prosecutorial evidence of one or more aggravating factors;" reduced ability to "give meaningful assistance to their counsel;" and reduced ability to be good witnesses because "their demeanor may create an unwarranted impression of lack of remorse for their crimes."[17] The Supreme Court also buttressed a growing national consensus against executing the intellectually disabled with its conclusion that neither of the penological purposes of the death penalty—retribution

---

[16] *Atkins*, 536 U.S. at 317-21.

[17] *Id.* at 318-21.

and deterrence—was served by their execution.[18]

¶113. But, rather than articulate a legal standard to determine who presented these concerns, the Court delegated that responsibility to the states.[19] In response, in *Chase*, we adopted a mental health definition associated with that label, which the *Atkins* Court cited but did not require.[20] Our *Chase* decision failed to take into account the fact that mental health professionals who articulate these definitions and change them over time bear no obligation to consider the legal concerns of the Eighth Amendment when they do so. The fact is, under our application of *Atkins* in *Chase*, offenders may be eligible for execution simply because we apply irrelevant characteristics for Eighth Amendment purposes, such as manifestation prior to age eighteen. For instance, a person at age thirty, but before his crime, who suffers a brain injury that results in a 60 I.Q. and severe deficits in two or more areas of social function, is currently eligible to be sentenced to death, simply because his mental disability did not manifest prior to age eighteen. But his current mental state is exactly the same as a person who is not eligible for that sentence because his condition did manifest prior to age eighteen. While manifestation prior to age eighteen may be significant in acquiring the mental health label of intellectual disability, it is wholly insignificant with respect to the Eighth Amendment concerns voiced by the *Atkins* Court.

¶114. This system is arbitrary on its face, and we should consider a judicial definition of

---

[18] *Id.*

[19] *Id.* at 317 (citing *Ford v. Wainwright*, 477 U.S. 399, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986)).

[20] *Chase*, 873 So. 2d 1027-28.

intellectual disability that meets constitutional concerns. Our approach should be to exclude from the death penalty only those who raise true constitutional concerns, rather than those who meet the mental health community's views of what it means to be intellectually disabled for their diagnostic purposes.

**WALLER, C.J., AND KING, J., JOIN THIS OPINION**.