# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-DR-00954-SCT

*DAVID DICKERSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/25/2012 |
| TRIAL JUDGE: | HON. LAMAR PICKARD |
| COURT FROM WHICH APPEALED: | COPIAH COUNTY CIRCUIT COURT |
| ATTORNEYS FOR PETITIONER: | SCOTT A. JOHNSON |
| | ALEXANDER DUNLAP MOORHEAD |
| | KASSOFF |
| | GREG RICHARD SPORE |
| ATTORNEYS FOR RESPONDENT: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BRAD ALAN SMITH |
| | ASHLEY LAUREN SULSER |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | POST-CONVICTION RELIEF DENIED - 04/08/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     A Copiah County jury convicted David Dickerson of killing his ex-girlfriend and mother of his daughter by shooting and then burning her.  On June 18, 2015, we affirmed Dickerson's capital-murder conviction and sentence of death, along with related convictions and sentences for arson and armed robbery.  ***Dickerson v. State***, 175 So. 3d 8 (Miss. 2015).

¶2.     Thereafter, a timely Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief was filed on Dickerson's behalf by the Mississippi Office of Capital Post-Conviction Counsel.  The State filed a Response in Opposition to the petition, to which Dickerson filed a rebuttal.

¶3.     As more fully set forth below, the Court concludes that Dickerson's petition should be denied.

## FACTS AND PROCEDURAL HISTORY

¶4.     In July 2012, a jury in the Circuit Court of Copiah County found Dickerson guilty of capital murder, as well as arson and armed robbery.  In the sentencing phase, the State advanced the following "elements of aggravation":

(1) Whether the capital offense was committed while [Dickerson] was engaged[] in the commission of burglary.

(2) Whether the offense was especially heinous, atrocious or cruel.

The jury ultimately determined that there were "insufficient mitigating circumstance(s) to outweigh the aggravating circumstance(s)," and Dickerson was sentenced to death for the capital-murder conviction.  The circuit court subsequently denied Dickerson's posttrial motion.

¶5.     On appeal, the Court affirmed Dickerson's convictions/sentences. *Dickerson*, 175 So. 3d at 12.  On October 8, 2015, the Court denied Dickerson's motion for rehearing.  The mandate issued on October 15, 2015.  On April 25, 2016, the United States Supreme Court denied Dickerson's petition for writ of certiorari. *Dickerson v. Mississippi*, 136 S. Ct. 1713 (2016) (mem.).

2

## STATEMENT OF THE ISSUES

(1)    Whether Dickerson is entitled to post-conviction collateral relief based upon an alleged intellectual disability.

(2)    Whether Dickerson is entitled to post-conviction collateral relief based upon an alleged due-process violation in the admission of expert testimony.

(3)    Whether Dickerson is entitled to post-conviction collateral relief based upon the alleged ineffective assistance of counsel in:

        (A)    failing to request a hearing on, and on-the-record determination of, Dickerson's intellectual-disability status;

        (B)    failing to challenge expert findings that Dickerson was competent to stand trial; and

        (C)    failing to conduct a thorough pretrial mitigation investigation.

## ANALYSIS

¶6.    From a procedural standpoint,

> [w]hen a conviction and sentence have been affirmed on appeal, the petitioner must seek and obtain leave from this Court before seeking relief in the trial court. Miss. Code Ann. § 99-39-7 (Rev. 2015). Leave is granted only if the application, motion, exhibits, and prior record show that the claims are not procedurally barred and that they "present a substantial showing of the denial of a state or federal right." Miss. Code Ann. § 99-39-27(5) (Rev. 2015). Well-pleaded allegations are accepted as true. *Simon v. State*, 857 So. 2d 668, 678 (Miss. 2003) (citing *Moore v. Ruth*, 556 So. 2d 1059, 1061-62 (Miss. 1990)).

> In capital cases, non-procedurally barred claims are reviewed using "'heightened scrutiny' under which all bona fide doubts are resolved in favor of the accused." *Crawford v. State*, 218 So. 3d 1142, 1150 (Miss. 2016) (quoting *Chamberlin v. State*, 55 So. 3d 1046, 1049-50 (Miss. 2010)). "[W]hat may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Crawford*, 218 So. 3d at 1150 (quoting *Chamberlin*, 55 So. 3d at 1049-50).

3

*Ronk v. State*, 267 So. 3d 1239, 1247 (Miss. 2019).

**(1)     *Whether Dickerson is entitled to post-conviction collateral relief based upon an alleged intellectual disability.***

*Background*

¶7.     As summarized by the Court on direct appeal,

[b]efore trial, Dickerson moved for a determination of his competency to stand trial *and a determination as to whether he was intellectually disabled*. The court appointed forensic psychologist [Dr. Lott] to evaluate Dickerson. Dr. Lott determined that Dickerson was *not mentally retarded*, but he was not able to determine whether Dickerson was competent to stand trial.

On Dr. Lott's recommendation, the court ordered further evaluation by the State Hospital at Whitfield to determine competency *and intellectual disability*. Dickerson was observed at the State Hospital for two months. Dr. Robert Storer, a forensic psychologist, and Dr. Reb McMichael, a forensic psychiatrist, concluded that Dickerson was mentally competent to stand trial and that he had no credible symptoms of mental illness. They found that Dickerson was uncooperative, malingering, and fabricating psychiatric symptoms. The doctors also concluded that Dickerson was *not mentally retarded*.

*Dickerson*, 175 So. 3d at 13-14 (emphasis added).

¶8.     Dr. Lott found that Dickerson's "Full-Scale IQ score of 72 falls in the borderline range." Applying the "Flynn effect," Dr. Lott adjusted that figure to "a Full Scale score of 71." Ultimately, Dr. Lott issued the "forensic opinio[n]" that "Dickerson does not meet the criteria set forth in [*Atkins*[1]]; [*Lynch*[2]]; and [*Chase*[3]]. Although his intellectual score falls

---

[1] *See Atkins v. Virginia*, 536 U.S. 304 (2002).

[2] *See Lynch v. State*, 951 So. 2d 549 (Miss. 2007).

[3] *See Chase v. State*, 873 So. 2d 1013 (Miss. 2004) ("*Chase III*").

4

within the range of mental retardation, it is my opinion that his adaptive deficits were not markedly impaired and he would not meet the criteria for mental retardation."

¶9.     During the subsequent competency hearing, "all three doctors testified that Dickerson had the capacity to confer with counsel and that he was mentally competent to stand trial." *Id.* at 14.  Dr. Lott's testimony at the competency hearing included

> that Dickerson had an adjusted full scale IQ of 71 but that he did not possess adaptive functioning deficits.  He did find that Dickerson had a cognitive disorder.  That disorder was evidenced by Dickerson's deficits in executive function, which is a person's ability to anticipate, problem-solve, and understand delayed gratification.

*Id.* at 16.  While Dr. McMichael

> acknowledged the possibility that Dickerson has a major mental disorder that could affect his competence, . . . he saw no objective evidence of that during Dickerson's two-month stay at the hospital.  He noted a lack of signs of PTSD but explained that Dickerson's lack of cooperation prevented the discovery of reliable data.

*Id.* at 17.  "Dickerson did not put on any evidence in the alternative[,]" and the circuit court concluded that Dickerson was "competent to stand trial."  *Id.* at 14.

¶10.    Dickerson later filed a "Motion to Bar the Death Penalty Do [sic] to the Defendant's Mental Condition."  The motion submitted that, "[l]ike juveniles and the intellectually disabled[,] there is a growing consensus against the execution of those with serious mental illness."  The motion provided "that even if [Dickerson] is competent to proceed to trial in an ordinary criminal prosecution he is not competent to proceed in a death penalty prosecution or otherwise should not face the death penalty do [sic] to his severe mental illnesses."  In advancing that argument, the motion maintained that Dickerson "has

5

significant deficits in [e]xecutive [f]unction, an IQ score in the mentally retarded range and a history of major mental illness." The circuit court denied the motion.

¶11. During the sentencing phase of trial, defense counsel called Dr. Lott to testify regarding the *Atkins*-related aspects of his evaluation of Dickerson. In the course of that evaluation, Dr. Lott testified that he

> reviewed a significant amount of prior records, including information that was obtained from family members that I think [defense counsel's] office had obtained in conversation with family members, prior treatment records, education records. And then, [defense counsel] also provided for me . . . a youth court custody matter which was adjudicated back in 1986, where [Dickerson] was found to be . . . abused and neglected . . . .

Ultimately, Dr. Lott opined that Dickerson

> did not meet the criteria for *Atkins*[.] [H]e had low intellectual functioning; but in my opinion, his adaptive deficits, daily living skills, were not markedly impaired, and that's based [i]n part on the testing that I did which his score fell in the below average range but also based on a comprehensive review of his history, work history, ability to function in the community prior to my evaluation.

Stated otherwise, Dr. Lott's "diagnosis" was that Dickerson "would be borderline intellectual disability, *not* mentally retarded." (Emphasis added.)

¶12. Dickerson then

> sought to submit to the jury the issue of whether he was intellectually disabled. He submitted a jury instruction [D-13] that set forth the *Atkins* criteria for establishing mental retardation and directed the jury to cease deliberations if it determined that the evidence established that the *Atkins* criteria were met. The trial court refused the instruction.

*Dickerson*, 175 So. 3d at 24. The circuit judge opined that "there's been no testimony from either side indicating that [Dickerson] was mentally retarded[,]" and [e]ven the testimony

6

of adaptive deficits did not reach the level of mental retardation. That said, "[s]entencing instruction D-12, which the circuit judge granted, told the jury that it could consider as mitigating evidence that Dickerson suffers from mental illness, suffers from brain damage, and has an IQ score in the mentally retarded range among other enumerated mitigating factors." *Id.* at 25. Dickerson was ultimately sentenced to death for his capital-murder conviction.

¶13. Dickerson's Motion for a New Trial asserted, *inter alia*, that the circuit court "erred in denying [his] motion to bar the death penalty due to his mental condition or to find him incompetent to participate in a death penalty trial[,]" as well as "in denying jury instruction D-13 at sentencing, essentially directing a verdict on the question of Intellectual Disability and depriving the only instruction on the 'theory of defense' to the death penalty." The circuit court denied that motion.

¶14. On direct appeal, the Court rejected Dickerson's argument that the circuit court "erred by refusing [his] requested penalty phase instruction regarding his *Atkins* intellectual disability defense." *Id.* at 23-25. The Court emphasized that

> Dickerson was evaluated for mental retardation prior to trial, and *three experts concluded that [he] was not mentally retarded*. Further, . . . because *Atkins* exempts only the mentally retarded from execution, not the mentally ill, and *there is no evidence in the record indicating that Dickerson is mentally retarded, Atkins is inapplicable to Dickerson's case*.

*Id.* at 24 (emphasis added). The Court added that sentencing instruction D-12 constituted "sufficient instruction regarding consideration of Dickerson's diminished mental capacity in mitigation." *Id.* at 25.

## *Argument*

¶15.   Dickerson once again contends that "he is intellectually disabled as defined by the Court in [*Atkins*] and thus he is ineligible for the death penalty."  Specifically, Dickerson insists that the PCR "and its accompanying affidavits[] contai[n] much evidence that" he "meets all three criteria for mental retardation"—"subaverage intellectual functioning[,]" "significant deficits in adaptive functioning[,]" and that the "deficits manifested before age 18."  The PCR further submits that it includes the requisite affidavit from "a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing intellectual disability and administering and interpreting, and in the evaluation of persons, for purposes of determining mental retardation."  *See **Chase III***, 873 So. 2d at 1029.  According to Dickerson, he "has presented a prima facie showing that he is intellectually disabled and is entitled at a minimum to an evidentiary hearing."

¶16.   In support of the claim, Dickerson references his alleged "adaptive functioning deficits" in the areas of (1) "[f]unctional academic skills" (e.g., that he failed the 4th and 6th grades; exhibited "below average" academic performance throughout his scholastic career; and "dropped out" in the 9th grade, although he did later obtain a General Educational Development ("GED") degree) and (2) "work, communication, self-direction, leisure, social skills, home living, health and safety, and self care."  With respect to (2), Dickerson notes trial testimony, along with several brief affidavits included as exhibits to the present pleadings, that reflect his struggles with work tasks as well as cursory references to his

8

alleged deficiencies in "people skills" and "self-care" and a purported question about his ability to live independently.

¶17.   The Court notes that several of the affiants testified during sentencing proceedings (i.e., Todd Martin, Hugh Montgomery, Kendal Rutledge, Gabriela Rutledge, David Barlett, Dorothy Dickerson).

¶18.   Preliminarily, the State responds that Dickerson's claim is barred by res judicata insofar as it "was raised and litigated at trial and on direct appeal." The State adds that "[t]he factual basis supporting [the] claim is fundamentally no different from the information that was presented at trial[,]" as Dickerson "relies almost exclusively on portions of the trial court record to support his claim that he is intellectually disabled." Even insofar as the present claim of intellectual disability is "different from the legal theory that [Dickerson] argued at trial or on direct appeal[,]" the State submits that the claim is subject to waiver, and Dickerson "does not show or even allege [the] cause and actual prejudice necessary to overcome" such.

¶19.   Alternatively, the State asserts that Dickerson fails to make a "substantial showing of the denial of a state or federal right." According to the State, Dickerson attempts to "suppor[t] his claim, in large part, with cherry-picked portions of the trial court record . . . —the same record th[e] Court said contained 'no evidence' of intellectual disability." (citing *Dickerson*, 175 So. 3d at 24). So the State deems the "factual basis supporting the claim" to be "cumulative" insofar as it is "based, in large part, on evidence that was presented at trial and reviewed on direct appeal." In advancing its argument, the State reiterates critiques of

9

the affidavits of Dr. Zimmerman and Dr. Root. Finally, the State argues that Dickerson's claim is "without merit[,]" as he fails to establish the requisite showing for an intellectual-disability claim.

*Analysis*

¶20. The Court has stated that

[t]he procedural bars of waiver, different theories, and *res judicata* and the exception thereto as defined in Miss. Code Ann. § 99-39-21(1-5) are applicable in death penalty PCR Applications. Rephrasing direct appeal issues for post-conviction purposes will not defeat the procedural bar of *res judicata*. The Petitioner carries the burden of demonstrating that his claim is not procedurally barred.

*Havard v. State*, 988 So. 2d 322, 333 (Miss. 2008) (citations omitted) (quoting *Lockett v. State*, 614 So. 2d 888, 893 (Miss. 1992)) (internal citations omitted).

¶21. Preliminarily, the Court notes that variants of Dickerson's intellectual-disability claim were repeatedly raised (and consistently rejected) at various stages of his trial proceedings and on direct appeal.

¶22. Pretrial, Dickerson filed a Motion for Mental Examination to Determine Competency to Stand Trial and Intellectual Disability. That resulted in evaluations by, and reports from, Drs. Lott, Storer, and McMichael which unanimously concluded that Dickerson "was not mentally retarded." *Dickerson*, 175 So. 3d at 14. At the pretrial competency hearing, those doctors each provided testimony to the same effect. Thereafter, Dickerson filed a "Motion to Bar the Death Penalty Do [sic] to the Defendant's Mental Condition" which included the argument that he "has significant deficits in [e]xecutive [f]unction, an IQ score in the mentally retarded range and a history of major mental illness." That motion was denied by

10

the circuit court. During sentencing proceedings, after being called by the defense, Dr. Lott again provided testimony on his intellectual-disability opinions regarding Dickerson. The circuit court then denied Dickerson's attempt "to submit to the jury the issue of whether he was intellectually disabled[,]" as it was not supported by the evidence. *Id.* at 24. Instead, the circuit court granted a sentencing instruction that allowed the jury to consider Dickerson's IQ score as "mitigating evidence . . . ." *Id.* at 25. In Dickerson's posttrial motion, he again challenged the circuit court's denial of his proposed sentencing instruction "on the question of [i]ntellectual [d]isability . . . ." However, the circuit court denied that motion. Finally, on direct appeal, the Court rejected Dickerson's claim that the circuit court "erred by refusing [his] requested penalty phase instruction regarding his *Atkins* intellectual disability defense." *Id.* at 23-25. The Court specifically noted that "Dickerson was evaluated for mental retardation prior to trial, and three experts concluded that [he] was not mentally retarded. . . . [T]here is no evidence in the record indicating that Dickerson is mentally retarded, [therefore,] *Atkins* is inapplicable to Dickerson's case." *Id.* at 24.

¶23.    Because "[r]ephrasing direct appeal issues for post-conviction purposes will not defeat the procedural bar of *res judicata*[,]" the Court finds that Dickerson's intellectual-disability claim is barred, as he "has not demonstrated a novel claim or a sudden reversal of law relative to this issue that would exempt it from the procedural bar of res judicata pursuant to" Mississippi Code Section 99-39-21(3) (Rev. 2020). *Havard*, 988 So. 2d at 333 (quoting *Lockett*, 614 So. 2d at 893).

11

¶24. That said, "*Atkins* exempts all intellectually disabled people from execution, even those people who are minimally intellectually disabled." *Carr v. State*, 283 So. 3d 18, 24 (Miss. 2019) (citing *Chase III*, 873 So. 2d at 1026). So, assuming *arguendo* that the instant claim fits within a fundamental constitutional rights exception to the res judicata bar, the Court will also consider its merits.

¶25. According to the Court

for entitlement to a hearing on the issue of intellectual disability, the defendant must produce an expert who testifies that: (1) the defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or the American Psychiatric Association; and (2) the defendant has completed the Minnesota Multiphasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering. *Chase*, 873 So. 2d at 1029. Subsequently, this Court clarified that our trial courts are free to use the MMPI-II or similar tests, the Wechsler Adult Intelligence Scales Test, the Structured Interview of Reported Symptoms (SIRS), the Validity Indicator Profile (VIP), and the Test of Memory Malingering (TOMM), and/or other tests suggested and approved by mental health professionals in determining intellectual disability and/or malingering. [*Lynch*, 951 So. 2d at 556]. At a hearing on intellectual disability, the defendant must prove by a preponderance of the evidence that "(1) he has significantly subaverage intellectual functioning; (2) he has deficits in two or more adaptive skills; (3) he was eighteen or younger when the retardation manifested itself; and (4) he is not malingering." [*Thorson v. State*, 76 So. 3d 667, 676 (Miss. 2011).] We also have held that, because *Atkins* is concerned with whether an individual was intellectually disabled at the time of the crime and whether the intellectual disability manifested prior to age eighteen, intellectual disability must be assessed retrospectively to those relevant times. *Goodin v. State*, 102 So. 3d 1102, 1115 (Miss. 2012). To this end, an individual's present functioning is relevant if it is informative of the individual's condition at the time of the crime and/or prior to age eighteen.

*Chase v. State*, 171 So. 3d 463, 468 (Miss. 2015) (*Chase V*).

IQ, alone, does not determine mental retardation. According to the DSM-IV, "it is possible to diagnose Mental Retardation in individuals with IQ's between 70 and 75 who exhibit significant deficits in adaptive behavior." Conversely,

Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning.

*Chase III*, 873 So. 2d at 1028 n.18; *see also Carr*, 283 So. 3d at 24) ("[A] person with an IQ score above 70 may have *such severe* adaptive behavior problems . . . that the person's actual functioning is comparable to that of individuals with a lower IQ score." (alterations in original) (quoting *Hall v. Florida*, 572 U.S. 701, 712 (2014) (quoting *Diagnostic and Statistical Manual of Mental Disorders* 37 (5th ed. 2013)). So, "if the defendant establishes by a preponderance of the evidence that his or her IQ is 75 or below, then the trial court must address the second *Atkins* prong—deficits in adaptive functioning." *Thorson*, 76 So. 3d at 683.

¶26. Drs. Lott, Storer, and McMichael considered exhaustive sources of information in reaching their intellectual-disability conclusions including, *inter alia*, Dr. Lott's earlier evaluations and reports; Dickerson's academic records; Dickerson's occupational history; Dickerson's personal and family medical, substance-abuse, and mental-health histories; and in-person testing and assessments of Dickerson. Because Dickerson's IQ fell within the requisite parameters of "75 or below," they addressed the additional prongs of the intellectual-disability analysis. Yet Dr. Lott's report here provided that Dickerson's "adaptive deficits were not markedly impaired and he would not meet the criteria for mental retardation." Likewise, the summary report of Drs. Storer and McMichael submitted that "our review of available records and interviews of collateral sources failed to identify significant deficits in [Dickerson's] adaptive functioning in conceptual, social, or practical

13

domains." The subsequent testimony of each doctor at the pretrial competency hearing aligned with those earlier findings. While the doctors opined that Dickerson had shown some "deficits in executive function," they were unanimous that he "did not possess adaptive functioning deficits." **Dickerson**, 175 So. 3d at 16. Dr. Lott further testified that Dickerson never had "a pre-18 year old diagnosis of developmental disability or mental retardation" and added that "there was no indication that he had exhibited any major adaptive deficits through early adulthood." Finally, there was testimony that indicated malingering by Dickerson while he had been at the State Hospital for additional observation.

¶27. While Dickerson now represents that his PCR and its attachments "contai[n] much evidence that" he "meets all three criteria for mental retardation[,]" the Court is unpersuaded that he has advanced the requisite showing to be granted leave to pursue another intellectual-disability claim in the circuit court.

¶28. Again,

> for entitlement to a hearing on the issue of intellectual disability, the defendant must produce an expert who testifies that: (1) the defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or the American Psychiatric Association; and (2) the defendant has completed the Minnesota Multiphasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.

**Chase V**, 171 So. 3d at 468 (citing **Chase III**, 873 So. 2d at 1029).

¶29. Dickerson's IQ score clearly fits within the parameters of "significantly subaverage intellectual functioning" and necessitates a full **Atkins** analysis. **Chase V**, 171 So. 3d at 468; *see also* **Thorson**, 76 So. 3d at 683.

14

¶30. To prove his alleged "significant deficits in adaptive functioning[,]" Dickerson relies largely upon materials reviewed by the trial experts; portions of the record from his direct appeal; and a few cursory affidavits included as exhibits to the present pleadings, with several of those affiants having previously testified during sentencing proceedings. Stated otherwise, much of the evidence was either already considered during Dickerson's trial proceedings and the subsequent direct appeal or is cumulative of evidence considered in those proceedings.

¶31. As to Dickerson's argument that "he was eighteen or younger when the retardation manifested itself," such is predicated upon school records that were plainly considered by Drs. Lott, Storer, and/or McMichael in rendering their previous opinions on Dickerson's intellectual-disability status, along with portions of the new affidavit of Dickerson's brother Troy that provides Dickerson struggled with basic tasks from an early age. *Chase V*, 171 So. 3d at 468. The Court agrees with the State that the referenced portion of Troy's affidavit is "entirely consistent with the findings and opinions of Drs. Lott, Storer, and McMichael." In other words, such evidence is cumulative and/or insufficient to warrant the relief sought by Dickerson.

¶32. Finally, the Court has held that "***Chase*** requires, *as a threshold to obtain an evidentiary hearing*, the production of such an expert as described above and the expert's corresponding opinion." ***Goodin***, 102 So. 3d at 1117. Yet the Court agrees with the State that Dickerson's experts fail to address the absence of "malingering." ***Chase V***, 171 So. 3d at 468.

¶33. Under the circumstances, the Court concludes that Dickerson's request for leave to proceed in the trial court with the intellectual-disability claim is not well-taken, as it is barred and/or Dickerson fails to present a substantial showing of the denial of a state or federal right.

**(2)    *Whether Dickerson is entitled to post-conviction collateral relief based upon an alleged due-process violation in the admission of expert testimony.***

### *Background*

¶34. At the pretrial competency hearing, defense counsel "accept[ed] Dr. Lott as tendered" as an expert in the field of forensic psychology without further voir dire. Similarly, Drs. Storer and McMichael were accepted as experts in their respective fields of forensic psychology and forensic psychiatry without further voir dire by defense counsel.

¶35. At trial, the State called Adel Shaker, M.D., and tendered him as an expert in the field of forensic pathology. Following voir dire by defense counsel, which included inquiries into Dr. Shaker possibly changing a report on the cause of death in a previous case, the circuit court accepted him "as an expert in the field of medicine, specializing in forensic pathology." The State later called Annie Malone, a forensic scientist at the Mississippi Crime Laboratory "specializing in serology . . . ." She was tendered and accepted as an expert in the field of serology without further voir dire or objection by defense counsel. The State then called Joseph Heflin, a forensic biologist at the crime lab "specializing in serology and DNA analysis . . . ." He was tendered and accepted as an expert in the "field of DNA" without further voir dire or objection by defense counsel.

### *Argument*

16

¶36. Dickerson now generally submits that the circuit court "fell way below its gatekeeping responsibilities by not making any on-the-record determinations regarding the qualifications of the individuals that were accepted as experts in their various fields nor did it make inquiries as to the admissibility and/or reliability of the evidence presented during . . . trial." Dickerson dedicates the majority of his argument to outlining the "analytical criteria for the admissibility of expert testimony . . . ." He then summarily challenges the aforementioned individuals accepted as experts during the pretrial and trial proceedings. According to Dickerson, the "erroneous admission" of such testimony "implicates" a due-process violation, and he is "entitled at the very least" to a hearing on "whether the experts['] testimony me[t] the admissibility standards as outlined in" *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993).

¶37. Preliminarily, the State responds that the claim is subject to waiver, as it "could have been and should have been raised at trial or direct appeal[,]" and Dickerson fails to "show [the] cause or actual prejudice necessary to overcome" it. Alternatively, the State asserts that Dickerson fails to make a "substantial showing of the denial of a state or federal right[,]" as his substantive claim "is set out in a single paragraph." Relatedly, the State opines that the claim "is without merit." The State broadly recounts "the relevant portions of the [t]ranscript" and argues that Dickerson "fails to offer any explanation as to how the trial court erred in allowing the six expert witnesses he identifies were unqualified to testify as experts in their respective fields. He does not identify the testimony or evidence that was inadmissible or unreliable."

*Analysis*

¶38. Again, "[t]he procedural bars of waiver, different theories, and *res judicata* and the exception thereto as defined in Miss. Code Ann. § 99-39-21(1-5) are applicable in death penalty PCR Applications." **Havard**, 988 So. 2d at 333 (quoting **Lockett**, 614 So. 2d at 893). Dickerson fails to address potential "relief from . . . waiver" of the claim via "a showing of cause and actual prejudice." Miss. Code Ann. § 99-39-21(1), (2) (Rev. 2020).

¶39. Even apart from the waiver bar, the Court finds that Dickerson's extremely general claim lacks an arguable basis. While Dickerson makes vague references to the "limited" voir dire conducted with respect to the experts, he fails to explain how each was unqualified and/or the particular testimony each offered that was inadmissible or unreliable. Stated succinctly, the claim falls woefully short of presenting "[w]ell-pleaded allegations . . . ." **Ronk**, 267 So. 3d at 1247 (citing **Simon**, 857 So. 2d at 678).

¶40. Based upon the aforementioned analysis, the Court concludes that Dickerson's request for leave to proceed in the trial court with the claim is not well-taken, as it is barred and/or Dickerson fails to present a substantial showing of the denial of a state or federal right.

***(3)***     ***Whether Dickerson is entitled to post-conviction collateral relief based on the alleged ineffective assistance of counsel.***

¶41. Substantively, ineffective-assistance-of-counsel claims involve

> a two-pronged inquiry: the defendant must demonstrate that his counsel's performance was deficient and that the deficiency prejudiced the defense of the case. To establish deficient performance, a defendant must show that his attorney's representation fell below an objective standard of reasonableness. To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial

18

would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Ross*, 954 So. 2d 968, 1003-04 (citations omitted). "'Reasonableness' is based on 'prevailing professional norms.'" *Ronk*, 267 So. 3d at 1248 (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)). "Our review is highly deferential to the attorney, with a strong presumption that the attorney's conduct fell within the wide range of reasonable professional assistance." *Ross v. State*, 954 So. 2d at 1004 (citing *Howard v. State*, 853 So. 2d 781, 796 (Miss. 2003)).

¶42. Dickerson generally contends that "defense counsel's representation . . . was grossly deficient" and that "he suffered cumulative prejudice from counsel's omissions and errors." The State responds that Dickerson "fail[s] to substantially show the denial of [his] right to effective assistance of counsel."

**(A)    *Whether counsel failed to request a hearing on, and on-the-record determination of, Dickerson's intellectual-disability status.***

*Argument*

¶43. According to the instant petition, "[t]o the extent the Court might find any of the issues regarding [Dickerson's] intellectual disability barred, he respectfully submits that his prior counsel was ineffective in failing to properly litigate the intellectual disability issue at trial and on direct appeal." Dickerson argues that "[t]rial counsel were ineffective due in part to a failure to discover and put on the evidence regarding [his] adaptive functioning deficits that is set out in the affidavits accompanying the PCR." Dickerson specifically emphasizes the affidavit of his brother Troy, a witness who was "not called at trial[,]" or even "contacted

19

by trial counsel[,]" but who could "provid[e] strong evidence of [Dickerson's] adaptive functioning deficits . . . ." According to Dickerson, "[i]f trial counsel had carried out a constitutionally acceptable investigation and called witnesses such as [Troy], they could have shown that [Dickerson] does indeed suffer from significant adaptive functioning deficits and that he has intellectual disability."

¶44. The State responds that Dickerson "fails to substantially show the denial of a state or federal right" as he "cites no authority which holds counsel are ineffective for failing to litigate the issue of intellectual disability when the evidence presented at trial is conclusive on the issue that the defendant is not intellectually disabled and is not entitled to a hearing on that matter." Relatedly, the State contends that the claim lacks merit. According to the State, "the record reflects that [Dickerson] did not produce the requisite information to obtain a hearing on the question of intellectual disability at trial." In fact, on direct appeal, the Court stated that "the experts concluded that Dickerson was *not* [intellectually disabled], and Dickerson offered no evidence to the contrary." ***Dickerson***, 175 So. 3d at 25. Even now, the State submits that Dickerson "has yet to provide this Court with expert opinion that, to a reasonable degree of psychological or psychiatric certainty, he is intellectually disabled, as defined by the American Association on Medical Retardation or the American Psychiatric Association; or that [he] is not malingering." So the State contends that Dickerson "fails to show actual prejudice" (i.e., "to demonstrate that but for counsels' failure to obtain a ***Chase*** hearing or a ruling on the issue of Intellectual Disability, the outcome of trial would have ended differently").

20

*Analysis*

¶45.    Pretrial, defense counsel sought and received a mental examination of Dickerson.  As recounted in Issue (1), *supra*, the issue of intellectual disability was exhaustively considered in the course of pretrial, trial, posttrial, and direct-appeal proceedings.  Given the highly deferential review of an attorney's conduct and the strong presumption of reasonable professional assistance, Dickerson fails to present a viable claim of deficient performance. ***Ross***, 954 So. 2d at 1004 (citing ***Howard***, 853 So. 2d at 796); *see also **Evans v. State***, 294 So. 3d 1152, 1166-67 (Miss. 2020); ***Corrothers v. State***, 255 So. 3d 99, 108 (Miss. 2017) ("[W]here defense counsel has sought and acquired a psychological evaluation for the defendant for mitigation purposes, counsel generally will not be held ineffective for failure to request additional testing." (internal quotation marks omitted) (quoting ***Ross***, 954 So. 2d at 1005)).

¶46.    Assuming *arguendo* that Dickerson makes an adequate showing of deficient performance, he fails to demonstrate actual prejudice.  As discussed above, much of the intellectual-disability evidence now relied on by Dickerson in advancing his claim of significant deficits in adaptive functioning was either already considered in his trial proceedings and the subsequent direct appeal or is cumulative of evidence considered in those proceedings.  Furthermore, for Dickerson to be "entitle[d] to a hearing on the issue of intellectual disability," the requisite expert opinion must include that he "has completed the Minnesota Multiphasic Personality Inventory-II (MMPI-II) and/or other similar tests, and . . . is not malingering." ***Chase V***, 171 So. 3d at 468 (citing ***Chase III***, 873 So. 2d at 1029);

*see also* **Goodin**, 102 So. 3d at 1117. Dickerson's PCR fails to include any such expert opinion.

¶47.     Based upon the aforementioned analysis, the Court concludes that Dickerson fails to "substantially show his counsel was deficient in this area or that [he] was prejudiced by an additional expert not testifying." **Corrothers**, 255 So. 3d at 109 (citing **Brown v. State**, 798 So. 2d 481, 498 (Miss. 2001)). Accordingly, Dickerson's request for leave to proceed in the trial court with the claim is not well-taken, as he fails to present a substantial showing of the denial of a state or federal right.

**(B)     Whether counsel failed to challenge expert findings that Dickerson was competent to stand trial.**

*Argument*

¶48.     Dickerson summarily suggests that "records from [the] Mississippi State Hospital show inconsistencies in entries, documentation and missing pages which raises questions about the validity of their findings." Further, he maintains that, "[a]t a minimum, trial counsel had a duty to conduct a **Daubert** hearing to ensure that the findings of these experts [at the pretrial competency hearing] met the minimum standards for admissibility." On that basis, the PCR asserts that "Dickerson is entitled to post-conviction relief or at a minimum a remand for an evidentiary hearing."

¶49.     In response, the State argues that Dickerson "cites no authority which holds trial counsel have a standing duty to conduct a **Daubert** hearing, particularly where the trial court appoints experts that are recommended by trial counsel." In any case, the State insists that "trial counsel were not ineffective for failing to challenge the qualifications of Drs. Lott,

22

Storer, and McMichael" nor that Dickerson can establish "he has suffered prejudice as a result."

<em>Analysis</em>

¶50.    The record reflects that defense counsel was cognizant of *Daubert*-related matters. For instance, defense counsel filed a Motion to Exclude Scientifically Unreliable Testimony "pursuant to MRE 702 and 403, ***Mississippi Transportation Comm'n v. McLemore***, 863 So. 2d 31 (Miss. 2003), [and *Daubert*]" regarding the "alleged expert testimony" of Deputy State Fire Marshall Medgar Gibbs.  So, in light of the "highly deferential" review of an attorney's conduct and the "strong presumption" that it "fell within the wide range of reasonable professional assistance[,]" the Court concludes that any decisions regarding *Daubert*-related challenges to Drs. Lott, Storer, and McMichael fell within the broad spectrum of strategic decisions.  ***Ross***, 954 So. 2d at 1004 (citing ***Howard***, 853 So. 2d at 796); *see also* ***Howard v. State***, 945 So. 2d 326, 348 (Miss. 2006) ("We find that counsels' decisions regarding the examination of Dr. Curtis were trial strategy.").

¶51.    Even assuming *arguendo* that there was deficient performance, the Court is unpersuaded that Dickerson has made an adequate showing of actual prejudice.  As recounted in Issue (2), *supra*, Dickerson fails to explain how each expert was unqualified and/or the particular testimony each offered that was inadmissible or unreliable.  "A defendant is not entitled to a favorable mental health evaluation, but is instead entitled to a competent psychiatrist and an appropriate examination."  ***Jordan v. State***, 912 So. 2d 800, 818 (Miss. 2005) (citing ***Ake v. Oklahoma***, 470 U.S. 68, 83 (1985)).

23

¶52. Accordingly, Dickerson's request for leave to proceed in the trial court with the claim is not well-taken, as he fails to present a substantial showing of the denial of a state or federal right.

**(C) *Whether counsel failed to conduct a thorough pretrial mitigation investigation.***

*Background*

¶53. The record reflects that Dickerson's trial counsel recognized the necessity of a proper mitigation investigation. For instance, during an early pretrial hearing, defense counsel stated that "in order to prepare a sentencing phase in a capital murder trial, we've got to interview everyone who has had contact with [Dickerson] in the course of his life, from employers, family members, we have to get records."

¶54. In the sentencing phase, Dickerson called fourteen witnesses—including family members, friends, coworkers, former employers, former employees of the Mississippi Department of Human Services, Dr. Lott, and Dr. Julie Schroeder. They collectively testified to the medications for "[n]erves" that Dickerson's mother took while pregnant with him; Dickerson's "rough" upbringing in extreme poverty and unkempt living conditions; the alcoholism and abusive behavior of Dickerson's father; the numerous family members that Dickerson lived with during the course of his childhood and rulings of the Chancery Court of Copiah County, Youth Court Division, that adjudicated him as "abused and neglected"; Dickerson's "mental problems"; his difficulties following directions and keeping focused on work tasks; his struggles with anything beyond "menial" jobs; the belief that he was a hardworking and "dependable employee" and that he was a "good friend" with a generous

24

spirit; his prior mental-health evaluations and Dr. Lott's conclusions thereon, including his *Atkins*-related conclusions (i.e., that Dickerson is not "mentally retarded"); and Dr. Schroeder's evaluation of Dickerson's "psychosocial history."

¶55. The jury was able to consider all of that evidence in mitigation during sentencing deliberations. Sentencing Instruction D-12 provided, in pertinent part, that:

> [t]he following examples of mitigating circumstances are provided by way of illustration. However, you are not bound by the mitigating circumstances listed here. You may find any fact or combination of facts to be mitigating, as you see fit.
>
> 1. [Dickerson] was a victim of child abuse and was taken from his parent's home because of this abuse;
>
> 2. [Dickerson] was present when his father abused his mother;
>
> 3. [Dickerson] lived in squalor and horrible poverty for many years of his childhood;
>
> 4. [Dickerson], as a result of his home situation, only completed the 9th grade;
>
> 5. [Dickerson] has a family history of mental illness;
>
> 6. [Dickerson] himself suffers from mental illness and has for much of his life;
>
> 7. [Dickerson] also suffers from brain damage in the area of Executive Function;
>
> 8. [Dickerson] has an IQ Score in the Mentally Retarded range;
>
> 9. [Dickerson's] father was violent to his family and others, had a history of alcohol abuse and was convicted of murder;
>
> 10. [Dickerson's] mother was taking prescription drugs during her pregnancy with him which may have affected his development;

25

11. [Dickerson] has family and friends who love and care about him;

12. Any other circumstance or combination of circumstances of the crime or of the life and character of [Dickerson] you believe should mitigate in favor of a sentence of life imprisonment without parole.

¶56. In the end, the jury "found that the aggravating factors outweighed the mitigating factors." *Dickerson*, 175 So. 3d at 34.

*Argument*

¶57. According to his petition, Dickerson's trial counsel were ineffective insofar as they "did not investigate and locate all available witnesses to testify on his behalf." Rather, he submits that

> [a]t sentencing[,] trial counsel called several witnesses in mitigation that at most only provided general, cursory information concerning [Dickerson]. The jury heard that the family was poor, [Dickerson's] father was abusive, and that he was removed from the home at age 15. The jury also heard [Dickerson] had a low IQ score and a possible personality disorder.

However, the petition suggests "[t]here was a wealth of evidence available to trial counsel that was not presented to the jury" and that with such additional evidence, "[t]here is a reasonable probability that at least one juror would have struck a different balance."

¶58. The State responds that

> [d]uring the sentencing phase, trial counsel presented evidence that demonstrated [Dickerson] had a low IQ; was a good worker, who needed constant supervision; was severely abused by members of his family; and had mental problems which were misunderstood. If anything, the affidavits he presently offers proves the additional witnesses he claims should have been called would have given cumulative testimony to those witnesses who were called or would have testified in a way that was contrary to trial counsels' theory of the case.

26

As such, the State submits that the evidence now offered by Dickerson fails to "demonstrate a 'reasonable probability that the result of the proceeding would have been different' had these individuals been called to testify" or that "this additional mitigating evidence 'would . . . have altered the sentencing profile presented.'" (quoting *Moffett v. State*, 156 So. 3d 835, 849 (Miss. 2014)).

*Analysis*

¶59.    With respect to mitigation-related investigations, "[w]hile counsel is not required to exhaust every conceivable avenue of investigation," *Ross*, 954 So. 2d at 1005 (citing *State v. Tokman*, 564 So. 2d 1339, 1343 (Miss. 1990)), there is "a duty 'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 691 (1984)); *see also Ronk*, 267 So. 3d at 1257 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (quoting *Wiggins*, 539 U.S. at 521-22)). "The assessment . . . includes not only what counsel discovered, but also whether that evidence would have led a reasonable attorney to investigate further." *Ronk*, 267 So. 3d at 1257-58 (citing *Wiggins*, 539 U.S. at 527).

¶60.    Furthermore,

> [i]f counsel's investigation is deemed deficient, prejudice is assessed by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." [*Wiggins*, 539 U.S. at 534]. No prejudice exists if "the new mitigating evidence 'would barely have altered the sentencing profile presented' to the decisionmaker . . . ." *Chamberlin v. State*, 55 So. 3d 1046, 1054 (Miss. 2010) (quoting *Sears v. Upton*, 561 U.S. 945, 954, 130 S. Ct.

27

3259, 3266, 177 L. Ed. 2d 1025 (2010)); *see also **Buckner v. Polk***, 453 F.3d 195, 207 (4th Cir. 2006) (holding that the new evidence, at best, merely "round[ed] out the details of a personal history already presented to the jury").

*Id.* at 1258; *see also **Hutto v. State***, 286 So. 3d 653, 658 (Miss. 2019).

¶61.    The Court is highly skeptical of Dickerson's claim that defense counsel was deficient in the pretrial mitigation investigation. The record reflects that defense counsel clearly recognized the necessity of such an investigation, and the "highly deferential" review of an attorney's conduct includes a "strong presumption" of "reasonable professional assistance." ***Ross***, 954 So. 2d at 1004 (citing ***Howard***, 853 So. 2d at 796). Following a pretrial mitigation investigation, defense counsel called fourteen separate witnesses during the sentencing phase who collectively explored, *inter alia*, Dickerson's troubling childhood, his mental-health issues, his work capabilities, and prior evaluations related to his mental health and "psychosocial history." The jury was then presented with an exhaustive jury instruction regarding the "mitigating circumstances" that could be considered in sentencing (including his "brain damage in the area of [e]xecutive function" and his "IQ [s]core in the [m]entally [r]etarded range"). While Dickerson alleges that trial counsel failed to present a "wealth" of available evidence to the jury, his discussion of such evidence is meager. Not only are "[c]laims that additional witnesses should have been called . . . disfavored[,]" but "[t]he decision to call a witness is [also] generally considered a matter of trial strategy." ***Brown v. State***, 306 So. 3d 719, 747 (Miss. 2020) (internal quotation marks omitted) (quoting ***Turner v. State***, 953 So. 2d 1063, 1074 (Miss. 2007); ***Brown v. State***, 749 So. 2d 82, 91 (Miss. 1999)); *see also **Evans***, 294 So. 3d at 1166. Furthermore, the affidavits that Dickerson now

28

relies upon are roundly cumulative of the evidence presented in mitigation at sentencing (in some cases, of the affiant's own testimony in that earlier proceeding). Under the circumstances, the Court concludes that Dickerson fails to adequately demonstrate deficient performance with respect to the instant claim.

¶62. Even assuming *arguendo* that Dickerson could establish deficient performance here, given the overwhelming evidence of his guilt and the clear existence of aggravating circumstances (e.g., "especially heinous, atrocious, or cruel"), the Court concludes that the additional evidence in this PCR fails to present an adequate showing to create "[a] reasonable probability that at least one juror would have struck a different balance." **Ronk**, 267 So. 3d at 1248 (internal quotation marks omitted) (quoting **Isham v. State**, 161 So. 3d 1076, 1089 (Miss. 2015)); *see also* **Evans**, 294 So. 3d at 1167. The new affidavits presented by Dickerson would hardly "have altered the sentencing profile presented[,]" *id.* (internal quotation marks omitted) (quoting **Chamberlain v. State**, 55 So. 3d 1046, 1054 (Miss. 2010)), as they "*merely expoun[d] on or roun[d] out facts that were presented to the jury*. Moreover, the above-described double-edged evidence is nowhere near the magnitude of the uncovered evidence in cases [in which post-conviction collateral relief was deemed warranted]." **Id.** at 1274 (emphasis added). "[T]he mitigating circumstances the jury was instructed to consider almost comprehensively touch upon the subjects raised in" the new affidavits. **Evans**, 294 So. 3d at 1167. Much of the "new" evidence is "cumulative" and was "thoroughly covered by the mitigation witnesses called to testify at trial." **Corrothers**, 255 So. 3d at 107; *see also* **Chamberlin**, 55 So. 3d at 1055 ("While it is true that the mitigation

29

evidence uncovered during post-conviction investigation is more detailed than that presented at trial, the jury was made aware of all of the abuse and addiction in Chamberlin's life.").

¶63.    Accordingly, Dickerson's request for leave to proceed in the trial court with the claim is not well-taken, as he fails to present a substantial showing of the denial of a state or federal right.

## CONCLUSION

¶64.    The Court concludes that Dickerson's PCR claims are barred and/or fail to present a substantial showing of the denial of a state or federal right.  Accordingly, Dickerson's PCR is denied.

¶65.    **POST-CONVICTION RELIEF DENIED.**

   **RANDOLPH, C.J., KITCHENS AND KING, P.JJ., MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**